[Nos. 57837-1, 57838-9. En Banc. August 9, 1993.]

*In the Matter of the Personal Restraint of*
ANDRE BRIGHAM YOUNG, *Petitioner.*

*In the Matter of the Detention of*
ANDRE BRIGHAM YOUNG, *Appellant.*

*In the Matter of the Personal Restraint of*
VANCE RUSSELL CUNNINGHAM, *Petitioner.*

*In the Matter of the Detention of*
VANCE RUSSELL CUNNINGHAM, *Appellant.*

2

3

6

8

*Robert C. Boruchowitz, Anne Engelhard, James A. Doerty,* and *William O. Salen* of *The Defender Association,* for petitioners/appellants.

*Norm Maleng, Prosecuting Attorney,* and *Timothy Michael Blood, Senior Deputy,* for respondent.

*John Q. La Fond* and *Kenneth S. Kagan* on behalf of the American Civil Liberties Union of Washington, amicus curiae for petitioners/appellants.

*David A. Summers* on behalf of Washington State Psychiatric Association, amicus curiae for petitioners/appellants.

DURHAM, J. — In this case, the sexually violent predator provisions of the Community Protection Act of 1990 are challenged by two people who have been civilly committed under its authority. Important constitutional and technical issues are raised by this unique legislation, which seeks to protect our citizens by incapacitating and attempting to treat those whose mental abnormalities create a grave risk of future harm. Although the ultimate goal of the statute is to treat, and someday cure, those whose mental condition causes them to commit acts of sexual violence, its immediate purpose is to ensure the commitment of these persons in order to protect the community. In this sense, it is similar to any other civil commitment. However, the Legislature has found that the exceptional risks posed by sexual predators, and the seemingly intractable nature of their illness, necessitates a specially tailored civil commitment approach. After exhaustive review of the numerous challenges raised by petitioners, we conclude that the sex predator provisions of the Community Protection Act of 1990 are constitutional. However, for reasons stated below, we reverse petitioner Cunningham's commitment, and remand petitioner Young's case for consideration of less restrictive alternatives.

The numerous issues raised by Young and Cunningham can be categorized as follows: First, petitioners claim that the act violates the ex post facto clause and the prohibition against double jeopardy. Resolution of those issues depends on whether the law is civil or criminal in nature. Second,

petitioners raise several substantive due process arguments. They claim that the State lacks sufficient justification to deprive them of their liberty, and that the sex predator statute amounts to unconstitutional preventive detention. They also contend, as a substantive matter, that dangerousness must be proved by evidence of a recent overt act, and that they are entitled to less restrictive conditions of confinement. Third, petitioners argue that there are several procedural deficiencies. They claim that the probable cause hearing should not be held ex parte, that the jury verdict should be unanimous, that the selection of the juries was flawed, that the act is void for vagueness, and that they were unconstitutionally denied a right to remain silent. Finally, several evidentiary issues are raised.

I

BACKGROUND

1. The Act.

The Community Protection Act of 1990 (the Act) was passed in response to citizens' concerns about the State's laws and procedures regarding sexually violent offenders. *See* Governor's Task Force on Comm'ty Protec., *Final Report* I-1 (1989) (hereinafter *Report*). The impetus for convening the task force was the commission of two violent crimes: the murder of a Seattle woman by an offender on work release, and the violent sexual attack on a young Tacoma boy. *Report*, at I-1. The Act contains 14 separate sections, dealing with such topics as registration of sex offenders, crime victims' compensation, background checks, and increased penalties for sex offenders. Laws of 1990, ch. 3, p. 12.

Part X of the Act is entitled "Civil Commitment" and is codified at RCW 71.09 (hereinafter Statute). Under the Statute, those defendants who are determined to be "sexually violent predators" can be involuntarily committed after they have served their sentences. The Legislature enacted extensive findings. Among those, the Legislature stated:

In contrast to persons appropriate for civil commitment under chapter 71.05 RCW, sexually violent predators generally have

antisocial personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. . . . The legislature further finds that the prognosis for curing sexually violent offenders is poor, the treatment needs of this population are very long term, and the treatment modalities for this population are very different than the traditional treatment modalities . . ..

RCW 71.09.010.

A "sexually violent predator" is someone "who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence." RCW 71.09.020(1). Crimes of sexual violence are enumerated in the Statute, and include crimes not usually considered sex offenses if they are determined beyond a reasonable doubt to have been "sexually motivated". RCW 71.09.020(4)(c). The term "personality disorder" is not defined by the Statute, but the term "mental abnormality" is defined as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts". RCW 71.09.020(2). "Predatory" acts are those directed at strangers, or individuals groomed by the offender for the purpose of victimization. RCW 71.09.020(3).

Under the Statute, when a person's sentence for a sexually violent offense has expired or is about to expire, the State is authorized to file a petition alleging the person to be a sexually violent predator. RCW 71.09.030; *see also* RCW 71.09.025. When the petition is filed, a judge must determine ex parte if "probable cause exists to believe that the person named in the petition is a sexually violent predator". RCW 71.09.040. When probable cause is found, the person is taken into custody and transferred to a facility for evaluation, pursuant to rules developed by the Department of Social and Health Services (DSHS). Within 45 days, the court shall conduct a trial to determine if the person is a sexually violent predator. RCW 71.09.050. Either party, or the court, may demand a jury trial.

The detainee has a statutory right to counsel. In addition, the detainee may be examined by a qualified expert of his or her choice. Both services will be provided if the person is indigent. RCW 71.09.050. The burden is on the State to prove, beyond a reasonable doubt, that the detainee is a sexually violent predator. RCW 71.09.060(1). If so, then he or she shall be committed to a facility "for control, care, and treatment" until "safe to be at large". RCW 71.09.060(1). The Statute limits treatment centers to mental health facilities located within correctional institutions. RCW 71.09.060(3); RCW 10.77.220.

The detainee must be examined annually to determine his or her mental condition, and the results must be provided to the trial court. RCW 71.09.070. In addition, the person may obtain an additional examination at state expense, if necessary. RCW 71.09.070. If it appears that the person is no longer a sexually violent predator, then the secretary of DSHS shall authorize the detainee to petition the court for release. RCW 71.09.090. When such a petition is filed, the court must order a hearing within 45 days. At the hearing, a jury may be demanded by either party, and the burden is on the State to prove, beyond a reasonable doubt, that the detainee is not safe to be at large. RCW 71.09.090(1).

A detainee may also petition the court directly without the approval of the secretary. RCW 71.09.090(2). Upon filing such a petition, a show cause hearing is held, at which time the petitioner has the right to be represented by appointed counsel, but not the right to be present. If the court finds probable cause that the detainee is no longer dangerous, then a full hearing is held with the same procedures as above. The court will not hold any further hearings unless the detainee can show a change of circumstances. RCW 71-.09.100.

2. <u>Andre Brigham Young</u>.

The petition in Andre Brigham Young's case was filed on October 24, 1990, 1 day prior to his release from prison for his most recent rape conviction. The certification for deter-

mination of probable cause (certificate) references two psychological evaluations of Young and describes his criminal history, which includes six violent felony rapes of adult female strangers. These rapes, which the record suggests may be only a partial accounting of Young's sexual assaults, occurred over the past 31 years during the intermittent periods when Young was not in custody.

Young's first series of known rapes occurred in the fall of 1962, when he broke into the respective homes of four different women, forcing them to engage in sexual intercourse. On at least two of these occasions, Young threatened his victims with a knife. In another incident, he raped a young mother with a 5-week-old infant nearby. Young was convicted in October 1963 on four counts of first degree rape, with two deadly weapon findings.

Less than a year later, while free on an appeal bond for his 1963 convictions, Young entered the home of another woman. With her child present, he exposed himself, threatened to hurt the child, and threatened to rape and kill the woman. Fortunately, he was frightened away. Young was charged with attempted rape, but was never tried for this offense because he was found incompetent.

Young was released on parole in January of 1972. After roughly 5 years of freedom, Young was again convicted of rape. As with the previously known offenses, he raped this woman after illegally entering her home in the early morning hours. Young pleaded guilty to third degree rape.

He was released from prison in 1980. In 1985, he raped another woman, again forcing his way into her apartment. Three small children were present. Young was convicted of first degree rape.

After reviewing the petition and supporting certificate, Judge Johnson issued an ex parte order which found probable cause, and directed the clerk to issue a no-bail arrest warrant and to transfer Young to the Special Commitment Center at Monroe. Following Young's detention at Monroe, counsel for Young brought motions seeking transportation

back to King County, a probable cause hearing to challenge the ex parte ruling, and bail — all of which were denied by Judge Johnson. On November 14, 1990, over Young's assertion of a right to remain silent, Judge Johnson ordered him to participate in psychiatric evaluations. Young refused to participate in the evaluations. A pretrial hearing was held in mid-January where the Superior Court rejected constitutional challenges to the Statute. Young was not allowed to attend this hearing.

Trial began on February 12, 1991, in front of Judge Bever. Both sides presented testimony by expert witnesses. Young called Dr. Nancy M. Steele, a psychologist who works with sex offenders in Minnesota. She testified that there is no particular mental disorder that makes a person likely to re-offend. In addition, Dr. G. Christian Harris testified that rape is a behavior, not a diagnostic category, and that he could not accurately predict that any particular person would re-offend. Young also called Dr. Fred Wise, who questioned the legitimacy of the diagnostic impressions made by the State's expert witness.

The State called Dr. Irwin Dreiblatt, a licensed clinical psychologist who has evaluated some 1,400 sexual offenders and treated approximately 700 in his 25 years of practice. Based upon a records review, Dr. Dreiblatt testified to a reasonable psychological certainty that it was his diagnostic impression that Young suffered from: (1) a severe personality disorder not otherwise specified, with primarily paranoid and anti-social features, (2) a severe paraphilia, which would be classified as either paraphilia sexual sadism or paraphilia not otherwise specified (rape). Dr. Dreiblatt stated that the severe paraphilia constituted a "mental abnormality" under the sex predator commitment Statute. Dr. Dreiblatt further concluded that the severe paraphilia — in combination with the personality disorder, the length of time spanning Young's crimes, his recidivism record, his use of weapons, his persistent denial of the crimes and his lack of empathy or remorse for his victims — made it more likely than not that Young

"would commit further sexually violent acts." Report of Proceedings Young (RPY) (Feb. 27, 1991), at 166.

The victims of Young's previous rape crimes testified regarding the circumstances of their assaults. Evidence was introduced pertaining to a 1972 conviction for a bomb threat. Defense motions for jury instructions regarding the presumption of innocence, the appropriate inference from Young's failure to testify, and others were denied by the court. At the request of the State, the jury was instructed that a unanimous verdict was required. On March 8, the jury concluded that Young was a "sexually violent predator".

3. Vance Russell Cunningham.

The petition in Vance Russell Cunningham's case was filed on December 21, 1990, about 4½ months after Cunningham had completed his most recent prison sentence for rape. As with Young, the certificate for determination of probable cause references two psychological evaluations of Cunningham and describes his extensive history of sexual crimes. Although Cunningham was only 26 when the petition was filed, his criminal history spans the prior 10 years and includes three convictions for raping adult female strangers.

Cunningham's first felony occurred in 1980 when he was 15 years old. A woman was walking through a Seattle-area park with her three young children, when Cunningham, armed with a knife, jumped out of some bushes and commanded, "nobody move". After the woman screamed, Cunningham fled. When he was apprehended, Cunningham confessed to the assault and admitted that his purpose was to force the woman to commit oral sex upon him. For this juvenile assault, he received a short sentence and some unspecified counseling.

In 1984, Cunningham raped a woman hitchhiker to whom he had offered a ride. Cunningham threatened to kill his victim, struck her several times, forced her to the ground, and then raped her. Cunningham pleaded guilty to second degree rape, and was sentenced to 31 months in prison.

Only 3 months after his release in November 1986, Cunningham committed his next rape. He grabbed the victim around the throat, and then forced her to have anal intercourse with him. Two months later, in April 1987, Cunningham assaulted another woman in a similar manner, forcing her to engage in additional acts of intercourse. For these actions, a jury found him guilty on two counts of second degree rape.

In an ex parte proceeding, after reviewing the petition and supporting affidavit, Judge Johnson found probable cause and ordered the clerk to issue a no-bail arrest warrant, and transfer Cunningham to the Special Commitment Center at Monroe. Judge Johnson also ruled that Cunningham "has no blanket Fifth Amendment privilege to refuse to answer any and all questions" put to him during the evaluation. Clerk's Papers, at 1183. On January 2, defense counsel brought motions to vacate the ex parte order and to allow Cunningham's participation in pretrial proceedings. The motions were denied. Cunningham was allowed to be present at his March 15, 1991, pretrial hearing.

Following jury selection, trial commenced on May 21, 1991, in front of Judge McCullough. The jury heard extensive testimony from expert witnesses for both sides. Cunningham called Dr. Steele to testify on his behalf. Based upon a records review, Dr. Steele stated that Cunningham was not suffering from a mental abnormality which would make him dangerous to women.

The State's expert was Dr. Leslie Rawlings, a licensed clinical psychologist who specializes in the assessment and treatment of sexual offenders. After reviewing Cunningham's records, Dr. Rawlings stated his diagnostic impression to a reasonable psychological certainty that Cunningham suffered from a severe paraphilia, not otherwise specified (rape). Dr. Rawlings further testified that paraphilia qualifies as a "mental abnormality" under the sex predator commitment Statute. Citing the paraphilia and several other factors, Dr. Rawlings concluded that "[i]t's my professional opinion that

Mr. Cunningham is more likely than not to engage in predatory acts of sexual violence if out in the community". Report of Proceedings Cunningham (RPC) (May 21, 1991), at 39.

The jury also heard testimony from the victims involved in Cunningham's previous rape convictions. Cunningham testified on his own behalf. Over defense objections, the jury was instructed that a unanimous verdict was not required. On May 31, 1991, the jury returned an 11-to-1 verdict which found Cunningham to be a "sexually violent predator".

Both Young and Cunningham brought personal restraint petitions and motions for immediate release, which were heard by this court in January 1991. The motions for release were denied, and the court accepted jurisdiction over the petitions. The petitions were consolidated with the direct appeals from the trials.

## II
### EX POST FACTO LAW AND DOUBLE JEOPARDY

Petitioners argue that the Statute is unconstitutional, because it violates the double jeopardy clause and the prohibition against ex post facto laws. Generally, these clauses apply to criminal matters. Thus, if the Statute is civil rather than criminal in nature, the Statute survives this challenge. We conclude that the Statute is civil, and hold that it does not violate either double jeopardy or the ex post facto clause.

■ The categorization of a particular statute as civil or criminal is largely a matter of statutory construction. *Allen v. Illinois*, 478 U.S. 364, 368, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986); *United States v. Ward*, 448 U.S. 242, 248, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980). The Supreme Court has adopted a 2-part analysis:

> First, we have set out to determine whether Congress, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other. Second, where Congress has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect as to negate that intention.

(Citations omitted.) *Ward*, 448 U.S. at 248-49. Thus, we look first to the language of the Statute and the legislative his-

tory, then turn to an analysis of the purpose and effect of the statutory scheme.

Both the language of the Statute and the legislative history evidence a clear intent to create a civil scheme. The section of the law as enacted by the Legislature is entitled "Civil Commitment", Laws of 1990, ch. 3, part X, and is codified at RCW Title 71, Mental Illness.[1] Persons committed are placed in the custody of the DSHS and housed at a DSHS treatment facility. RCW 71.09.060(1); WAC 275-155. The Department of Corrections has no role in caring for committed sex predators. In addition, the provisions at issue here are compared in the text of the Statute to RCW 71.05, the civil involuntary commitment act. RCW 71.09.010.

An examination of the Act's legislative history further supports a civil intent. The Legislature's final report refers to the section as "Civil Commitment", and reports that "[a] new civil commitment procedure is created for 'sexually violent predators.'" *1990 Final Legislative Report*, 2nd SSB 6259, at 144. Moreover, the Legislature enacted a bill substantially similar to that proposed by the Governor's Task Force on Community Protection. In its report, the Task Force quite plainly recommended a civil law, because neither the criminal system nor the existing civil system could accommodate the special needs of sex predators. Report, at II-20 through II-23. In light of the Statute's language and legislative history, then, it is clear that the Legislature intended a civil statutory scheme.

■ This does not end our inquiry, however. We next consider whether the actual impact of the Statute is civil or criminal:

> [T]he civil label is not always dispositive. *Where a defendant has provided "the clearest proof"* that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" that the proceeding be civil, it must be considered criminal . . ..

---

[1]The title "Civil Commitment" is not properly a part of the law. Laws of 1990, ch. 3, § 1404. However, it provides evidence of the legislative intent to treat this Statute as civil.

(Italics ours.) *Allen*, 478 U.S. at 369 (quoting *Ward*, 448 U.S. at 248-49). In performing this inquiry, we take particular notice of the high level of proof petitioners must satisfy in order to overcome the presumption favoring the Legislature's civil designation. *Allen*, 478 U.S. at 369.

In *Allen*, a Fifth Amendment self-incrimination case, the Supreme Court held that an Illinois statute which provided for civil commitment of sexually dangerous persons was properly categorized as civil, not criminal. *Allen*, at 369. Under the Illinois statute, a "sexually dangerous person" was one who suffered from "a mental disorder . . . coupled with criminal propensities to the commission of sex offenses". *Allen*, 478 U.S. at 366 n.1. In holding the statute civil, the Court found several factors significant: the Illinois Supreme Court had determined that the statute was civil in nature; the State had a statutory obligation to provide care and treatment designed to effect recovery for those committed; detainees were discharged when no longer dangerous; and, conditional release was also available. *Allen*, at 369. The Court summarized:

> In short, the State has disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement.

*Allen*, at 370.

The provisions of our sexually violent predator Statute are remarkably similar to those of the Illinois statute upheld in *Allen*. Most notably, the Statute's definition of "sexually violent predator" is almost identical to Illinois' definition of "sexually dangerous person" — both require a mental disorder which leads to the commission of violent sex offenses. *Compare* RCW 71.09.020(1) *with* Ill. Ann. Stat. ch. 38, ¶ 105-1.01 (Smith-Hurd 1980). Similarly, both the Illinois statute and RCW 71.09 require care and treatment for the committed individual, and provide this care in a psychiatric facility. *Compare* RCW 71.09.060(1) *and* RCW 71.09.080 *with* Ill. Ann. Stat. ch. 38, ¶ 105-8 (Smith-Hurd 1980). In addition, under both schemes, committed persons must be released as

soon as they are no longer dangerous. *Compare* RCW 71.09-.090(1) *with* Ill. Ann. Stat. ch. 38, ¶ 105-9 (Smith-Hurd 1980).

■■ Petitioners argue that the Court's holding in *Allen* is distinguishable because the Illinois statute provides for commitment in lieu of serving a criminal sentence. While this is a distinguishing factor, it is by no means a contradictory one. That the State of Illinois chose to forego criminal liability for the offender's initial actions does not require Washington to do so. *See, e.g., Bailey v. Gardebring*, 940 F.2d 1150 (8th Cir. 1991) (constitutional to both civilly commit and imprison sexually dangerous individual), *cert. denied*, 112 S. Ct. 1516 (1992). As we discuss below, the goals of civil and criminal confinement are quite different; the former is concerned with incapacitation and treatment, while the latter is directed to retribution and deterrence. The sexually violent predator Statute is not concerned with the criminal culpability of petitioners' past actions. Instead, it is focused on treating petitioners for a current mental abnormality, and protecting society from the sexually violent acts associated with that abnormality.

Additional guidance for the determination of whether a statute is criminal was set forth by the Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 9 L. Ed. 2d 644, 83 S. Ct. 554 (1963). The court should consider:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment — retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . ..

(Footnotes omitted.) These factors weigh heavily on the side of a finding that this Statute is civil. Although the scheme here does involve an affirmative restraint, the civil commitment goals of incapacitation and treatment are distinct from

punishment, and have been so regarded historically. Moreover, no finding of scienter is required to commit an individual who is a sexually violent predator; the determination is made based on a mental abnormality or personality disorder rather than on one's culpability. Furthermore, the Statute is necessary to serve the legitimate and vital purpose of protecting innocent potential victims.[2]

■ ■ Finally, we also inquire into the purposes of the legislation. Our construction of the Statute should be that which best advances the legislative purpose. *Wichert v. Cardwell*, 117 Wn.2d 148, 151, 812 P.2d 858 (1991). The Statute promotes civil ends rather than criminal ones. The Statute before us is primarily concerned with incapacitation and treatment. Incapacitation has often been recognized as a legitimate civil goal. *See Addington v. Texas*, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979). Treatment is also a proper aim of civil legislation. As one commentator has remarked:

> the Sexually Violent Predator civil commitment scheme is not a method of punishment. Washington is undertaking to treat the offender pursuant to its parens patriae power and to protect the public "from the dangerous tendencies of some who are mentally ill" pursuant to the state's police power.

Marie A. Bochnewich, Comment, *Prediction of Dangerousness and Washington's Sexually Violent Predator Statute*, 29 Cal. W. L. Rev. 277, 278 (1992).

In contrast, the Supreme Court has said repeatedly that retribution and deterrence are punitive, and thus are the goals of criminal law. *United States v. Halper*, 490 U.S. 435, 448, 104 L. Ed. 2d 487, 109 S. Ct. 1892 (1989); *Mendoza-Martinez*, 372 U.S. at 168; *Bell v. Wolfish*, 441 U.S. 520, 539

---

[2]The mere fact that the State chose to establish a special commitment procedure for sex predators has no bearing on the question of whether the law is civil or criminal. As the Supreme Court stated in *Allen*, "[t]hat the State has chosen not to apply the Act to the larger class of mentally ill persons who might be found sexually dangerous does not somehow transform a civil proceeding into a criminal one". *Allen*, 478 U.S. at 370.

n.20, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979). Thus, the Court reasoned:

> a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.

*Halper*, at 448; *accord Austin v. United States*, ___ U.S. ___, 125 L. Ed. 2d 488, 498, 113 S. Ct. 2801 (1993). This court has applied similar reasoning:

> [T]he determinative factors for resolving a double jeopardy claim are whether [the sanction] has a rational connection to some purpose other than retribution or deterrence, and whether the sanction appears excessive in relation to the alternative purpose.

*O'Day v. King Cy.*, 109 Wn.2d 796, 817, 749 P.2d 142 (1988) (citing *Mendoza-Martinez*, 372 U.S. at 168-69). Absent any indication that a criminal purpose was intended, or actually served by the statute, the stated civil goals of the Legislature are controlling. *See Mendoza-Martinez*, 372 U.S. at 168-69.

■ In sum, we conclude that the sexually violent predator Statute is civil, not criminal, in nature. The language and history of the Statute so indicate, as do its purposes and effect. Petitioners have failed "to provide the clearest proof" to the contrary.

Turning to the specific challenges made here, petitioners argue that RCW 71.09 violates the ex post facto clause. The prohibition against ex post facto laws is expressly leveled against states in U.S. Const. art. 1, § 10.

> A law violates the ex post facto prohibition if it aggravates a crime or makes it greater than it was when committed; permits imposition of a different or more severe punishment than was permissible when the crime was committed; or, changes the legal rules to permit less or different testimony to convict the offender than was required when the crime was committed.

*State v. Edwards*, 104 Wn.2d 63, 70-71, 701 P.2d 508 (1985) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L. Ed. 648 (1798)). The purposes of the prohibition are to give individuals fair

24

warning of the effect of legislative acts, and to restrict the power of the State to impose arbitrary or vindictive legislation. *Weaver v. Graham*, 450 U.S. 24, 28-29, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981).

■ ■ The ex post facto clause has been interpreted to apply only to criminal matters. *Calder v. Bull, supra; see* William W. Crosskey, *The True Meaning of the Constitutional Prohibition of Ex-Post-Facto Laws*, 14 U. Chi. L. Rev. 539 (1946-1947), *cited in* 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 2.4 n.9 (1986). In addition, at least one court has held that sexual psychopath proceedings did not involve the ex post facto prohibition because it was not a criminal remedy. *State ex rel. Sweezer v. Green*, 360 Mo. 1249, 1253, 232 S.W.2d 897, 24 A.L.R.2d 340 (1950). Because the Statute is civil, therefore, the ex post facto prohibition does not apply.

Petitioners argue further that the prohibition against double jeopardy is violated by the Act. The Fifth Amendment provides, in part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb". The double jeopardy clause prohibits multiple punishment for the same offense. *Halper*, 490 U.S. at 440; *O'Day*, 109 Wn.2d at 816. This prohibition "has deep roots in our history and jurisprudence." *Halper*, at 440.

■ ■ In general, the prohibition against double jeopardy applies only to criminal measures:

"[a] double jeopardy violation does not occur simply because two adverse consequences stem from the same act." *In re Mayner*, [107 Wn.2d 512, 730 P.2d 1321 (1986)] at 521. Double jeopardy does not apply "unless the sanction sought to be imposed in the second proceeding is punitive in nature so that the proceeding is essentially criminal." *Beckett v. Department of Social & Health Servs.*, 87 Wn.2d 184, 188, 550 P.2d 529 (1976) [*overruled on other grounds by Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984)]; *see Emory v. Texas Bd. of Med. Examiners*, 748 F.2d 1023, 1026 (5th Cir. 1984).

*O'Day*, at 816-17. The prohibition has, however, been found to be implicated in some circumstances by "civil" penalties as well as "criminal". In *Halper*, the Supreme Court found

that a civil fine imposed in a Medicare fraud case after a criminal sentence had been served violated double jeopardy. *Halper*, at 452. The Supreme Court focused on whether the sanction was remedial or punitive in nature, noting that the purpose actually served by the sanction, rather than the underlying nature of the proceeding, determined the issue. *Halper*, at 447 n.7. The Court held that a "civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment." *Halper*, at 448.

Here, as noted above, the statutory scheme has not been shown to serve any punitive goal; indeed, it does not. Moreover, in *Halper*, the Court inquired as to the remedial function of the civil penalties, and questioned if the Government could impose a monetary penalty after a criminal sentence had been exacted. Essentially, *Halper* ruled that the State may not bring a separate civil action based on criminal conduct that is not rationally related to a legitimate civil goal. *Halper*, at 449. Incapacitation and treatment, though, are legitimate civil goals, as evidenced by the ordinary civil commitment law. *See Addington v. Texas*, 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979). Therefore, enforcement of the Act does not violate double jeopardy.

## III
### SUBSTANTIVE DUE PROCESS

Petitioners argue that substantive constitutional requirements are violated by the Statute, and that it should be overturned. The propriety of the statutory scheme here is a matter of first impression. Although somewhat different from our sex predator Statute, the United States Supreme Court has upheld statutory schemes where sexual offenders were committed in lieu of serving their criminal sentences. Until 1984, and the passage of sentencing reform, Washington utilized such a scheme. Former RCW 71.06. In *Minnesota ex rel. Pearson v. Probate Court*, 309 U.S. 270, 84 L. Ed. 744, 60 S. Ct. 523, 126 A.L.R. 530 (1940), the Court refused to invalidate a "psychopathic personality" proceed-

ing. As noted earlier, the Court has upheld confinement under the Illinois Sexually Dangerous Persons Act. *Allen v. Illinois*, 478 U.S. 364, 374, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986).

In their substantive challenges to the Statute, petitioners argue that it does not serve a valid state purpose. They further argue that the Statute violates due process because petitioners are not mentally ill and that constitutionally required treatment is precluded due to the conditions of confinement. As such, they argue that the Statute authorizes unconstitutional preventive detention. Finally, petitioners argue that evidence of a recent overt act which proves dangerousness is mandated. Although we agree that evidence of an overt act may be required in *limited* circumstances, we conclude that there are no substantive constitutional impediments to the sexually violent predator scheme.

1. Strict Scrutiny.

The constitution requires that a person shall not be deprived of life, liberty, or property without due process of law. U.S. Const. amends. 5, 14; Const. art. 1, § 3. An individual's liberty interest is important and fundamental. *United States v. Salerno*, 481 U.S. 739, 750, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987). When a state's laws impinge on fundamental rights, such as liberty, they are constitutional only if they further compelling state interests, and are narrowly drawn to serve those interests. *State v. Farmer*, 116 Wn.2d 414, 429, 805 P.2d 200, 812 P.2d 858 (1991); *In re Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986).

Applying the strict scrutiny test to the Statute as a whole, it is irrefutable that the State has a compelling interest both in treating sex predators and protecting society from their actions. *Addington v. Texas*, 441 U.S. 418, 426, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979); *Vitek v. Jones*, 445 U.S. 480, 495, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980). The Supreme Court has stated that:

> The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also

has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.

*Addington*, 441 U.S. at 426; *see also Salerno*, 481 U.S. at 748-49 ("the government may detain mentally unstable individuals who present a danger to the public"). Here, petitioners Young and Cunningham were diagnosed with a mental disorder and share a lengthy criminal history of violent rape. Other individuals encompassed under the commitment law share similar profiles. In such circumstances, the Court has consistently upheld civil commitment schemes. *See Addington v. Texas, supra*; John Q. La Fond, *An Examination of the Purposes of Involuntary Civil Commitment*, 30 Buff. L. Rev. 499, 513 (1981).

Any criticism of the Statute, then, would have to be based on the requirement that it be narrowly drawn. We will address petitioners' various "least restrictive alternative" arguments in subsequent sections of this opinion.

2. Mentally Ill and Dangerous.

Petitioners argue that the Statute allows the State to hold individuals without proving that the person is both mentally ill and dangerous. In *Addington*, the Supreme Court held that a person must be both mentally ill[3] and dangerous for a civil commitment to be permissible under the due process clause of the constitution. *Accord, e.g., Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992). The sexually violent predator Statute satisfies this due process standard.

The Statute clearly requires proof of a "mental abnormality or personality disorder" for civil commitment. RCW 71.09.020(1). Although "mental abnormality" is not defined in the American Psychiatric Ass'n, *Diagnostic and Statisti-*

---

[3]Although the Supreme Court in *Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992) used the term "mentally ill" almost exclusively, the Court has always used the term "mentally ill" interchangeably with "mentally disordered". *See, e.g., Allen v. Illinois* (478 U.S. 364) (upholding an Illinois statute requiring both a "mental disorder" and dangerousness); *Addington v. Texas* (441 U.S. 418) (using both terms). Indeed, the terms are largely synonymous. *Longman Dictionary of Psychology and Psychiatry* 451 (1984).

*cal Manual of Mental Disorders* (3d rev. ed. 1987) (*DSM-III-R*),[4] the Legislature has given it a meaning which incorporates a number of recognized mental pathologies:

> In using the concept of "mental abnormality" the legislature has invoked a more generalized terminology that can cover a much larger variety of disorders. Some, such as the paraphilias, are covered in the *DSM-III-R*; others are not. The fact that pathologically driven rape, for example, is not yet listed in the *DSM-III-R* does not invalidate such a diagnosis. The *DSM* is, after all, an evolving and imperfect document. Nor is it sacrosanct. Furthermore, it is in some areas a political document whose diagnoses are based, in some cases, on what American Psychiatric Association ("APA") leaders consider to be practical realities. *What is critical for our purposes is that psychiatric and psychological clinicians who testify in good faith as to mental abnormality are able to identify sexual pathologies that are as real and meaningful as other pathologies already listed in the DSM.*

(Italics ours.) Alexander D. Brooks, *The Constitutionality and Morality of Civilly Committing Violent Sexual Predators*, 15 U. Puget Sound L. Rev. 709, 733 (1991-1992). In both Young's and Cunningham's respective trials, expert witnesses for petitioners and the State were competent and able to offer testimony on the mental pathologies underlying the sex predator condition. These same experts testified that the statutory term "mental abnormality" was nearly identical to the notion of "mental disorder" as defined in the *DSM-III-R*.[5]

---

[4]The *DSM-III-R* is a document frequently relied upon by courts in determining the acceptance of psychiatric diagnosis. *E.g.*, *Heller v. Doe*, ___ U.S. ___, 125 L. Ed. 2d 257, 271-72, 113 S. Ct. 2637 (1993); *State v. Hutsell*, 120 Wn.2d 913, 917, 845 P.2d 1325 (1993); *In re Rice*, 118 Wn.2d 876, 890-91, 828 P.2d 1086, *cert. denied*, 121 L. Ed. 2d 344 (1992).

[5]Despite the testimony at trial, petitioners suggest that a "mental abnormality" is not a true mental illness because it is a term coined by the Legislature, rather than the psychiatric and psychological community. This argument is meritless. Over the years, the law has developed many specialized terms to describe mental health concepts. For example, the legal definitions of "insanity" and "commitment" vary substantially from their psychological and psychiatric counterparts. The *DSM-III-R* explicitly recognizes this fact, noting that the scientific categorization of a mental disorder may not be "wholly relevant to legal judgments". *DSM-III-R*, at xxix.

Both Young and Cunningham were primarily diagnosed with a mental disorder known as "paraphilia". Classified as a sexual disorder, the essential features of a paraphilic mental illness are "recurrent intense sexual urges and sexually arousing fantasies generally involving either (1) nonhuman objects, (2) the suffering or humiliation of oneself or one's partner (not merely simulated), or (3) children or other nonconsenting persons". *DSM-III-R*, at 279. The *DSM-III-R* contains an extensive discussion of paraphilia; none of the experts at Young's and Cunningham's commitment trials challenged the acceptance of this diagnostic category.

The specific diagnosis offered by the State's experts at each commitment trial was "paraphilia not otherwise specified." This is a residual category in the *DSM-III-R* which encompasses both less commonly encountered paraphilias and those not yet sufficiently described to merit formal inclusion in the *DSM-III-R*. *DSM-III-R*, at 280. As the testimony reflected, paraphilias are classified as either mild, moderate or severe. Young and Cunningham were both diagnosed with a severe paraphilia; *i.e.* "[t]he person has repeatedly acted on the paraphilic urge". *DSM-III-R*, at 281.

The expert testimony further reflected that both Young and Cunningham could be classified within the "paraphilia not otherwise specified" category as suffering from "rape as paraphilia". According to the seminal article on this mental disorder, portions of which were read into testimony at both trials, certain patterns of rape fall into this diagnosis:

> Clinical interviews of rapists, however, provide support for the classification of rape as a paraphilia, because many individuals report having recurrent, repetitive, and compulsive urges and fantasies to commit rapes. These offenders attempt to control their urges, but the urges eventually become so strong that they act upon them, commit rapes, and then feel guilty afterwards with a temporary reduction of urges, only to have the cycle repeat again. This cycle of ongoing urges, attempts to control them, breakdown of those attempts, and recurrence of the sex crime is similar to the clinical picture presented by exhibitionists, voyeurs, pedophiles, and other traditionally recognized categories of paraphiliacs.

Gene G. Abel & Joanne-L. Rouleau, *The Nature and Extent of Sexual Assault, in Handbook of Sexual Assault: Issues,*

*Theories and Treatment of the Offender* 9, 18 (W.L. Marshall, et al. eds., 1990) (hereinafter *Handbook of Sexual Assault*).[6] The article goes on to state that "[s]uch a categorization raises the issue of the offender's need for psychiatric and psychological treatment before he can gain control over his sexual assaultiveness". *Handbook of Sexual Assault*, at 20. It recognizes that "[i]n our culture, this has meant that not only must the individual so categorized serve his time for his illegal act of sexual assault, but he must also serve time receiving psychiatric and psychological treatment for his paraphilia". *Handbook of Sexual Assault*, at 20.

In Young's trial, the State's expert testified that Young also suffered from an "anti-social personality disorder". Like paraphilia, anti-social personality disorder is classified as a mental disorder in the *DSM-III-R*. In general, a personality disorder diagnosis is appropriate "only when *personality traits* are inflexible and maladaptive and cause either significant functional impairment or subjective distress". *DSM-III-R*, at 335. Anti-social personality disorder is characterized by a long-term pattern of irresponsible and anti-social behavior. *DSM-III-R*, at 342.

Petitioners nonetheless argue that the Statute does not address a mental disorder because treatment of sex offenders is impossible. Indeed, the Legislature adopted specific findings that "sexually violent predators . . . have antisocial personality features which are unamenable to existing mental illness treatment", and that "the prognosis for curing sexually violent offenders is poor". RCW 71.09.010. Moreover, as argued by amicus, it is commonly believed that violent sex offenders cannot be successfully treated, especially involun-

---

[6]According to the expert testimony, rape as paraphilia falls within the *DSM-III-R* category of "paraphilia, not otherwise specified". CPY (Feb. 27, 1991), at 132. Dr. Steele, an expert for petitioners who testified at both trials, agreed that rape is a paraphilia. CPY (Mar. 1, 1991), at 148; CPC (May 23, 1991), at 66. The article by Doctors Abel and Rouleau reviews the pertinent scientific literature and concludes that "[t]he weight of scientific evidence, therefore, supports rape of adults as a specific category of paraphilia". *Handbook of Sexual Assault*, at 19. Moreover, the *DSM-III-R* specifies violent rape as a symptom of "paraphilia sexual sadism". *DSM-III-R*, at 287-88.

tarily. Brief of Amicus Curiae Washington State Psychiatric Association, at 10; *see also ABA Criminal Justice Mental Health Standards*, at 7-8.1 n.16 (1989).

There are two flaws in this line of argument. First, the mere fact that an illness is difficult to treat does not mean that it is not an illness.[7] For example, some forms of schizophrenia cannot be treated, but the diagnosis nonetheless remains a valid one. The Legislature should not be admonished for its honest recognition of the difficulties inherent in treating those afflicted with the mental abnormalities causing the sex predator condition.

Second, petitioners have failed to show that the *specific* conditions of confinement are incompatible with treatment. As the Supreme Court noted in *Allen*:

> Petitioner has not demonstrated, and the record does not suggest, that "sexually dangerous persons" in Illinois are confined under conditions incompatible with the State's asserted interest in treatment. Had petitioner shown, for example, that the confinement of such persons imposes on them a regimen which is essentially identical to that imposed upon felons with no need for psychiatric care, this might well be a different case.

*Allen*, 478 U.S. at 373. Similarly, the Washington Statute provides for treatment, and petitioners have failed to prove that this goal cannot be effectuated under the Statute's terms.

■ Due process concerns are similarly satisfied because the sexually violent predator Statute requires dangerousness as a condition for civil commitment. RCW 71.09.020(1). The Court has said that mental illness is insufficient, standing alone, to justify confinement. *O'Connor v. Donaldson*, 422 U.S. 563, 575, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975). Instead, there must be a showing that the person is dangerous to the community. *O'Connor*, 422 U.S. at 582-83 (Burger, C.J., concurring). Similarly, this court has often said that

---

[7]It is by no means clear that the mental abnormalities and personality disorders underlying the sex predator condition are "untreatable". Of the experts who testified at trial, many reported that a significant portion of their practices were devoted to treating sex offenders. Also, the *Handbook of Sexual Assault* contains six chapters discussing the treatment of sex offenders. *See Handbook of Sexual Assault*, at 279-382.

"the only basis for involuntary commitment is dangerousness". *In re Patterson*, 90 Wn.2d 144, 153, 579 P.2d 1335 (1978), *overruled on other grounds by Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984); *In re Levias*, 83 Wn.2d 253, 257, 517 P.2d 588 (1973), *overruled on other grounds by Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984).

Here, the Statute inherently applies only to dangerous offenders. Under the very definitions of the Statute, only "sexually violent offenders" — those "likely to engage in predatory acts of sexual violence" — are subject to its provisions. RCW 71.09.020(1). Individuals involuntarily committed under the Statute possess a proven history of rape and sexually motivated violence. Their likelihood of re-offense is extremely high. According to supplemental authority submitted by petitioners themselves and specific to the sex predator program, "[u]sing theoretically relevant and empirically tested predictors, predictive accuracy [of sexual recidivism] can realistically be expected to be in the 80% range". Dr. Vernon Quinsey, *Review of the Washington State Special Commitment Center Program for Sexually Violent Predators*, at 9 (appended to Wash. State Inst. for Pub. Policy, *Review of Sexual Predator Program: Community Protection Research Project* (Feb. 1992)); *see also Heller v. Doe*, ___ U.S. ___, 125 L. Ed. 2d 257, 272-73, 113 S. Ct. 2637 (1993) ("Previous instances of violent behavior are an important indicator of future violent tendencies.").[8] Thus, there is no doubt that commitment is predicated on dangerousness under the Statute.[9]

---

[8]Although predictions of future dangerousness are certainly less than perfect, this court has previously decided that predictions of dangerousness do not violate due process. *In re Harris*, 98 Wn.2d 276, 280-81, 654 P.2d 109 (1982).

[9]The dissent seriously underplays the quantum of proof necessary to meet the dangerousness prong of the sex predator statute. The State must do far more than merely reprove a past criminal act, or present testimony from someone who thinks that individual is still dangerous. See dissent, at 62-65. Instead, the statute requires *proof beyond a reasonable doubt* that the person has been convicted or charged with a crime of sexual violence, and suffers from a mental abnormality or personality disorder "which makes the person likely to engage in predatory acts of sexual violence". RCW 71.09.020(1). In the current cases, testimony came from

In short, the Statute satisfies the due process concerns outlined in *Addington v. Texas* (441 U.S. 418). Expert testimony in both the Young and Cunningham trials diagnosed petitioners with a mental disorder, and informed the jury of the dangerousness arising out of that disorder.[10]

3. Nature and Duration.

In a related issue, the Supreme Court has stated that due process " 'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.' " *Jones v. United States*, 463 U.S. 354, 368, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972)). Thus, an inquiry into the purposes of the Statute is required.

Two underlying purposes for commitment are often advanced — treatment and incapacitation. *See* La Fond, *supra*. The Statute at issue here serves both purposes. The Statute requires that constitutionally mandated care and treatment be provided, RCW 71.09.080, and charges DSHS with the responsibility of providing "control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large". RCW 71.09.060(1). DSHS has promulgated regulations to effect this purpose. An individualized treatment plan is developed and maintained for each person committed under the Statute, including:

(a) A description of a person's specific treatment needs;
(b) An outline of intermediate and long-range treatment goals, with a projected timetable for reaching the goals;
(c) The treatment strategies for achieving the treatment goals;
(d) A description of [sexual predator program] staff persons' responsibility; and

---

licensed mental health professionals familiar with petitioners' past conduct and current mental profiles.

[10]Citing a handful of law review articles, the dissent claims that RCW 71.09 is unrelated to any known mental illness. In making this claim, however, the dissent does not respond to the extensive expert testimony presented at both Young's and Cunningham's respective trials.

(e) Criteria for recommending to the court whether a person should be released from the [sexual predator program].

WAC 275-155-040(1). The regulations governing the program make it clear that committed individuals shall "[r]eceive adequate care and individualized treatment". WAC 275-155-050(3)(a).

The purpose of incapacitation is also well served by this Statute. The task force responsible for drafting the legislation initially noted that an additional goal of the program was to "confine repeat violent offenders who present an extreme safety risk". *Report*, at I-1. Sexually violent predators, those who are adjudged likely to engage in acts of violence, are housed in a special commitment center which must be located within a correctional institution. The record reflects that the current facility is rated maximum security. Given the nature of sexually violent predators, it would not be safe to house them in a less secure setting. Thus, it appears that the commitment is related to the purpose of the Statute.

Finally, petitioners argue that they are constitutionally entitled to the least restrictive alternatives to confinement available.[11] It is true that those who are civilly committed must be treated differently than criminals. The Supreme Court has said this explicitly:

> Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.

*Youngberg v. Romeo*, 457 U.S. 307, 321-22, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982). Nevertheless, we need not place undue limitations on the administration of state institutions. *Romeo*, at 322.

In light of these considerations, giving the presumption of correctness to "decisions made by the appropriate professional" (here, DSHS), individuals who have been invol-

---

[11] A related argument is advanced that petitioners have a right to treatment. The Statute provides that any constitutional requirements concerning care and treatment must be met. RCW 71.09.080.

untarily committed have the right to "conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests". *Romeo*, at 324. Here, the dangerousness of committed sex predators justifies a secure confinement facility. Moreover, the regulations governing the commitment facility specifically provide a wider range of privileges than those associated with a prison setting:

(3) A person the court commits to the SPP [sexual predator program] *shall*:

(a) Receive adequate care and individualized treatment;

(b) Be permitted to wear the committed person's own clothes and keep and use the person's personal possessions, except when deprivation of possessions is necessary for the person's protection and safety, the protection and safety of others, or the protection of property within the SPP;

(c) Be permitted to accumulate and spend a reasonable amount of money in the person's SPP account;

(d) Have access to reasonable personal storage space within SPP limitations;

(e) Be permitted to have approved visitors within reasonable limitations;

(f) Have reasonable access to a telephone to make and receive confidential calls within SPP limitations; and

(g) Have reasonable access to letter writing material and to:

(i) Receive and send correspondence through the mail within SPP limitations; and

(ii) Send written communication regarding the fact of the person's commitment.

(Italics ours.) WAC 275-155-050.

There is no evidence in the record addressing either the actual conditions of confinement, or the quality of treatment. These issues are not currently before the court. Facially, the Statute and associated regulations suggest that the nature and duration of commitment is compatible with the purposes of the commitment.

4. *Foucha v. Louisiana.*

Petitioners next argue that the Supreme Court's recent decision in *Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992) forbids the civil commitment of sexually violent predators because it constitutes unconstitu-

tional preventive detention. As is patently obvious, however, both the facts and the statute in *Foucha* differ significantly from those presented here. Contrary to petitioners' claim, our holding is consistent with and supportive of *Foucha*.

In *Foucha*, the Court overturned a Louisiana statute dealing with insanity acquittees because the release procedures were inadequate. The Court described the statute as follows:

> When a defendant in a criminal case pending in Louisiana is found not guilty by reason of insanity, he is committed to a psychiatric hospital unless he proves that he is not dangerous. This is so whether or not he is then insane. After commitment, if the acquittee or the superintendent begins release proceedings, a review panel at the hospital makes a written report on the patient's mental condition and whether he can be released without danger to himself or others. If release is recommended, the court must hold a hearing to determine dangerousness; the acquittee has the burden of proving that he is not dangerous. If found to be dangerous, the acquittee may be returned to the mental institution whether or not he is then mentally ill.

*Foucha*, 112 S. Ct. at 1781-82. Four years after Terry Foucha had been committed, following an acquittal by reason of insanity of aggravated burglary and illegal discharge of a firearm, the superintendent of the facility where he was held recommended that he be released. The review panel reported that "there had been no evidence of mental illness since admission". *Foucha*, 112 S. Ct. at 1782.

The trial court heard medical testimony that Foucha was probably in remission from what had been a temporary condition — likely a drug induced psychosis. The court heard further testimony that Foucha had an "antisocial personality", that such condition was not a mental illness, and that he had no other mental disorders. However, an ultimate medical determination about his dangerousness could not be made. Instead, a doctor testified only that he could not "certify that [Foucha] would not constitute a menace to himself or others if released". *Foucha*, 112 S. Ct. at 1782. Based solely on this equivocal testimony, the trial court returned him to the mental institution.

The United States Supreme Court reversed, holding that absent a determination of current mental illness and danger-

ousness, continued confinement under the Louisiana scheme was impermissible. *Foucha*, 112 S. Ct. at 1788-89. The Court relied on three reasons to overturn the confinement and the underlying statute. First, the statute did not meet the minimal due process requirement "that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha*, 112 S. Ct. at 1785. The State of Louisiana was continuing to confine Foucha in a psychiatric facility even though he was not suffering from a mental disease or illness. Second, the statute did not provide constitutionally adequate procedures. *Foucha*, 112 S. Ct. at 1785. Finally, the Court determined that Foucha was not confined under any previously recognized authority of the State. It recognized three ways in which an individual could be confined: by the criminal justice system; pursuant to civil commitment law; or under the narrow circumstances set forth in *United States v. Salerno, supra. Foucha*, 112 S. Ct. at 1785-86.

The Statute here withstands the scrutiny required in *Foucha*. As explained above, the sexually violent predator Statute is narrowly tailored to serve a compelling state interest. Also, before a person can be civilly committed, the State must prove that the individual is mentally ill[12] and dangerous — a condition that was satisfied in Young's and Cunningham's respec-

---

[12]Petitioners raise the issue that, under *Foucha*, it is impermissible to civilly commit someone who has an "antisocial personality", because that condition is not a mental disorder. According to petitioners, the sex predator Statute violates this holding. This argument belies a careless reading of the *Foucha* facts. First, the condition in *Foucha* was an "antisocial personality". This condition falls within the *DSM-III-R* section entitled "V Codes for Conditions Not Attributable to a Mental Disorder" and is formally designated "antisocial behavior"; it is not a mental disorder. As such, anti-social behavior cannot form the basis for civil commitment. *Foucha v. Louisiana* (112 S. Ct. 1780). The sex predator Statute, however, requires proof of a "personality *disorder*" as one of the alternative means of commitment. (Italics ours.) RCW 71.09.020. Unlike "antisocial behavior", an "antisocial personality disorder" is a recognized mental disorder which is defined in the *DSM-III-R*, at 342. Second, petitioners ignore the limitations inherent in the Court's discussion of this issue. *Foucha* came before the Court on a limited trial record. As such, the Court pointed out several times that its discussion on the status of Foucha's condition as a mental illness was "according to the testimony given at the hearing in the trial court". *Foucha*, 112 S. Ct. at 1785.

tive trials. As such, the sexually violent predator commitment scheme falls squarely within *Foucha's* definition of constitutionally permissible civil commitment. *See Foucha*, 112 S. Ct. at 1784-86. "The State may also confine a mentally ill person if it shows 'by clear and convincing evidence that the individual is mentally ill and dangerous' ". *Foucha*, 112 S. Ct. at 1786 (quoting *Jones*, 463 U.S. at 362).

 In addition, the sex predator Statute does not suffer from the procedural infirmities that rendered Louisiana's insanity acquittee scheme unconstitutional. Under the Washington law, the State must satisfy the highest burden of proof to civilly commit a sex predator. A higher burden of proof "tends to equalize the risks of an erroneous determination that the subject of a commitment proceeding has the condition in question". *Heller*, 125 L. Ed. 2d at 272. Whereas Louisiana attempted to continue Foucha's confinement without claiming that he suffered from a mental illness, the Washington Statute makes proof of a *current* mental disorder a condition of commitment. Also, in regard to dangerousness, Louisiana placed the burden on Foucha, while the Washington Statute places the burden on the State. In contrast to the Louisiana statute, the sexually violent predator Statute is the type of "sharply focused scheme" which the Supreme Court called for in *Foucha*. 112 S. Ct. at 1786.

Our interpretation of the holding in *Foucha* finds support in Justice O'Connor's crucial concurring opinion. In providing the necessary fifth vote which formed the majority, Justice O'Connor carefully pointed out the limitations of that holding:

> I write separately, however, to emphasize that the Court's opinion addresses only the specific statutory scheme before us, which broadly permits indefinite confinement of sane insanity acquittees in psychiatric facilities.

*Foucha*, 112 S. Ct. at 1789 (O'Connor, J., concurring). Where the incapacitation is more closely tailored to "reflect pressing public safety concerns related to the acquittee's continuing dangerousness", continued confinement may be permitted. *Foucha*, 112 S. Ct. at 1789 (O'Connor, J., concurring).

■ The dissent claims that the sex predator program constitutes "preventive detention" because the statute is not "civil commitment" and sex predators are "detained" for an indefinite period of time. We reject this characterization. First, the sex predator Statute does not rely upon the *Salerno* line of cases. It falls comfortably within the "civil commitment" category discussed in *Foucha* because the State must prove both a mental illness and dangerousness. Second, civil commitments are not subject to any rigid time limit. Rather, the commitment is tailored to the nature and duration of the mental illness. Finally, unlike pretrial detainees, those committed under the sex predator statute have been through a full trial with a complete range of procedural protections. In short, despite the dissent's protests to the contrary, the sex predator Statute does not create any ominous "dangerousness court", but rather follows traditional civil commitment norms.

Even though petitioners potentially face a long period of civil commitment, the sexually violent predator Statute is wholly sustainable. Those committed under the sex predator Statute have been through a full trial with a complete range of procedural protections. From this trial, a jury has determined that the State has met the highest burden possible — beyond a reasonable doubt — in proving that the committed individual suffers from a mental abnormality which renders him a danger to the community. Although the period of confinement is not predetermined, the Statute's release provisions provide the opportunity for periodic review of the committed individual's current mental condition and continuing dangerousness to the community.

In sum, the circumstances of the *Foucha* case clearly dictated the result reached by the United States Supreme Court. The case before us deals with vastly different facts and law, and is wholly consistent with the principles enunciated in *Foucha*.

5. Overt Act.

Petitioners next argue that the constitution requires evidence of a recent overt act to prove dangerousness, relying

on *In re Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982). Harris had been detained under RCW 71.05.150(1)(a), which provides for short-term detention for evaluation and treatment if "a person, as a result of a mental disorder, presents a likelihood of serious harm to others or himself". *Harris*, at 279. The phrase "likelihood of serious harm" is defined explicitly in RCW 71.05.020(3), as follows:

(a) A substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others[.]

The definition contains the inference that the harm at issue be evidenced by some act or behavior. The court noted that "such evidence must be recent to be meaningful". *Harris*, at 284. Thus, interpreting RCW 71.05, this court held that involuntary commitment was only permitted upon:

a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one which has caused harm or creates a reasonable apprehension of dangerousness.

*Harris*, at 284-85.

However, the court rejected an additional requirement of "imminent danger", relying primarily on statutory interpretation. *Harris*, at 283-84. We compared the emergency detention provisions contained in RCW 71.05.150(2) — which *do* require that the likelihood of serious harm be imminent, with the remaining procedures contained in RCW 71.05 — which do *not* impose the condition of imminence. *Harris*, at 282. We concluded that the omission expressed the Legislature's intent not to impose the condition of imminence. *Harris*, at 282. In addition, the court noted:

the practical effect of being placed in the hospital will usually eliminate the "imminence" of one's dangerousness. If we were

to require "imminent danger" as a requirement of continued commitment, we would be creating a standard that (in many cases) would invalidate commitment as soon as it occurs. . . . A standard of "imminent danger" for all commitments would be impracticable.

*Harris,* at 284.

In many cases, sexually violent predators are incarcerated prior to commitment. *Cf. In re LaBelle,* 107 Wn.2d 196, 204, 728 P.2d 138 (1986). For incarcerated individuals, a requirement of a recent overt act under the Statute would create a standard which would be impossible to meet. Other jurisdictions have rejected the precise argument made by petitioners because it creates an impossible condition for those currently incarcerated. *See People v. Martin,* 107 Cal. App. 3d 714, 725, 165 Cal. Rptr. 773 (1980). We agree that "[d]ue process does not require that the absurd be done before a compelling state interest can be vindicated." *Martin,* 107 Cal. App. 3d at 725. Indeed, in drafting the Statute, the Legislature expressly noted that the involuntary commitment statute, RCW 71.05, was an inadequate remedy because confinement prevented any overt act. RCW 71.09.010. We conclude that where the individual is currently incarcerated no evidence of a recent overt act is required.

However, where an individual has been released from confinement on a sex offense (as referenced in RCW 71.09-.030) and lives in the community immediately prior to the initiation of sex predator proceedings, the above rationale does not apply. Under *Harris,* proof of a recent overt act is necessary to satisfy due process concerns when an individual has been released into the community. 98 Wn.2d at 284. When an individual has been in the community, the State has the opportunity to prove dangerousness through evidence of a recent overt act. We construe statutes to render them constitutional. Therefore, we hold that the State must provide evidence of a recent overt act in accord with *Harris* whenever an individual is not incarcerated at the time the petition is filed. For non-incarcerated individuals, a sex predator petition under RCW 71.09.030 must include an allega-

tion of a recent overt act sufficient to establish probable cause when considered in conjunction with the other factors listed in RCW 71.09.040.

Petitioner Cunningham was released from prison and living in the community for some 4½ months before the State filed a sex predator petition. He was gainfully employed as an assistant engineer on a ship and was planning to go to sea for a period of time. The State did not allege a recent overt act in its petition, nor did the State offer such evidence at Cunningham's trial. We find, therefore, that the proof presented at trial was insufficient and Cunningham's commitment as a sex predator is hereby reversed.

 In sum, the Statute does not violate substantive due process. The State's interest in preventing the sort of harm exacted by sexually violent predators is clearly compelling. The Statute complies with due process because it conditions civil commitment on a finding of both a mental disorder and dangerousness. The Supreme Court's opinion in *Foucha* does not alter this long-established law, nor forbid Washington's efforts to ameliorate an important societal problem. As noted by the chair of the task force when he transmitted the *Report* to the Governor, the Statute is "a serious response commensurate with the harm caused". *Report*, Letter of transmittal from Norm Maleng to The Hon. Booth Gardner (Nov. 28, 1989).

## IV
### PROCEDURAL DUE PROCESS

Petitioners contend that the Statute must be overturned because it deprives them of their liberty without adequate procedural protections and denies them equal protection. Several procedural infirmities are alleged: that the ex parte finding of probable cause denies meaningful predeprivation due process, that consideration of less restrictive alternatives to confinement is necessary, that the burden of proof at trial is inadequate because the jury need not be unanimous,

that the Statute is void for vagueness, and that petitioners were unconstitutionally denied a right to remain silent.[13]

1. Probable Cause Hearing.

Petitioners argue that an adversarial probable cause hearing is required by due process considerations. During the 45-day period prior to trial, despite repeated requests, petitioners were denied the opportunity to appear personally in court. Although this detention is preceded by a judicial determination that probable cause exists, RCW 71.09.040, the decision is made ex parte and without prior notice to the detainee.

In contrast, under RCW 71.05 (involuntary commitment), an individual is subject first to a 72-hour detention for evaluation and treatment. RCW 71.05.150(1)(b). That statute also requires a psychological evaluation within the first 24 hours of detention. RCW 71.05.210. A probable cause hearing, at which the individual may be present, is then held to determine if an additional 14-day detention is warranted. RCW 71.05.200.

 The standard for determining the appropriate level of procedure that is due prior to depriving an individual of his right to life, liberty or property is well established:

[T]he specific dictates of due process generally requires [sic] consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's

---

[13]Petitioners argue additionally that the Statute is facially invalid because of defects in the procedures for release. The release provisions of the two civil commitment statutes differ. The maximum period of commitment under RCW 71.05 is 180-day intervals. At the expiration of each period, the detainee is entitled to the full range of procedural protections, including jury trial. RCW 71.05.310, .320(2). The confinement interval for sex predators is 1 year, and after one petition has been rejected, the burden shifts to the detainee to show he or she is safe to be at large. RCW 71.09.090-.100. Because neither petitioner here has applied for release, the record before the court is insufficient to decide if the Statute contains adequate release provisions. We decline to decide the matter on the limited information before us.

interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976). We have said that this is "[t]he appropriate test for reviewing the constitutional adequacy of involuntary commitment procedures". *In re LaBelle*, 107 Wn.2d 196, 221, 728 P.2d 138 (1986) (citing *Dunner v. McLaughlin*, 100 Wn.2d 832, 839, 676 P.2d 444 (1984)); *see also In re Schuoler*, 106 Wn.2d 500, 510, 723 P.2d 1103 (1986); *In re Harris*, 98 Wn.2d 276, 285, 654 P.2d 109 (1982). Thus, the court must balance the extent of the individual's interest against the interests of the State.

 In addition, equal protection principles of the Fourteenth Amendment and article 1, section 12 of our constitution require that we examine the protections contained in the Statute in light of protections afforded those who are committed under the involuntary commitment statute. The equal protection clause requires that "persons similarly situated with respect to the legitimate purposes of the laws receive like treatment".[14] *In re Knapp*, 102 Wn.2d 466, 473, 687 P.2d 1145 (1984). To determine if equal protection has been violated, we examine the purpose of the Statute — incapacitation and treatment of violent offenders.

It is important to note at the outset that there are good reasons to treat mentally ill people differently than violent

---

[14]Both this court and the United States Supreme Court have repeatedly applied this provision to a comparison of different commitment schemes. Thus, commitment of the mentally retarded has been compared to involuntary civil commitment, *Heller v. Doe*, ___ U.S. ___, 125 L. Ed. 2d 257, 113 S. Ct. 2637 (1993); court-ordered treatment has been compared to the sexual psychopathy statute, *In re Knapp*, 102 Wn.2d 466, 687 P.2d 1145 (1984); commitment for incompetency to stand trial has been compared to civil commitment under RCW 71.05, *In re Patterson*, 90 Wn.2d 144, 579 P.2d 1335 (1978); commitment of the criminally insane has been compared to civil commitment of the mentally ill, *Baxstrom v. Herold*, 383 U.S. 107, 15 L. Ed. 2d 620, 86 S. Ct. 760 (1966); commitment in lieu of sentence under the Wisconsin sex crimes law has been compared to commitment for treatment under the mental health act, *Humphrey v. Cady*, 405 U.S. 504, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972); and, commitment for incompetency to stand trial has been compared with all other civil commitments, *Jackson v. Indiana*, 406 U.S. 715, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972).

sex offenders. *See People v. Pembrock*, 62 Ill. 2d 317, 322, 342 N.E.2d 28 (1976) (A sexually dangerous person "creates different societal problems, and his past conduct is different in degree and kind from the conduct of persons in the larger, more inclusive class defined under the Mental Health Code".). Sexually violent predators are generally considerably more dangerous to others than the mentally ill. Treatment methods are also markedly different for the two populations. *See* RCW 71.09.010. Nevertheless, these distinctions between the two groups must be related to any differences in treatment under the respective statutes. That is, "[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made". *Baxstrom v. Herold*, 383 U.S. 107, 111, 15 L. Ed. 2d 620, 86 S. Ct. 760 (1966). The Supreme Court has said that the dangerousness of the detainee "may be a reasonable distinction for purposes of determining the type of *custodial or medical care* to be given, but it has *no relevance whatever* in the context of the opportunity to show whether a person is mentally ill *at all*". (Some italics ours.) *Baxstrom*, at 111.

All individuals who are involuntarily committed are entitled to procedural and substantive protections. *Jackson v. Indiana*, 406 U.S. 715, 724, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972). Thus, the Court in *Jackson* held:

> that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release . . . Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment.

*Jackson*, 406 U.S. at 730. A person cannot be deprived of procedural protections afforded other individuals merely because the State makes the decision to seek commitment under one statute rather than another statute. *Humphrey v. Cady*, 405 U.S. 504, 512, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972). Thus, in regard to the initial determination of whether there is probable cause for detention, an individual

is entitled to the same opportunity to appear before the court to contest detention in any civil commitment proceeding.

Application of the due process and equal protection principles discussed above requires that detainees under the Statute be afforded an opportunity to appear in person to contest probable cause. Petitioners' liberty interests are substantially infringed during the 45-day period leading up to trial. Absent an opportunity to appear and respond to the petition for commitment, we believe that the risk of wrongful detention is too great.

In contrast, the burden of providing notice and an opportunity for a detainee to appear is not too onerous. The breadth of such a hearing would remain within the discretion of the trial court. Insofar as this hearing is limited to verification of the detainee's identity and the determination of probable cause to believe that he or she is a sexually violent predator, we do not anticipate a lengthy proceeding. Because many of the individuals affected will be imprisoned prior to commitment, *see* RCW 71.09.030, notification of the proceedings is simple.

In *Harris*, we imposed such requirements as a function of "inherent judicial power". *In re Harris*, 98 Wn.2d 276, 287, 654 P.2d 109 (1982). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands". *Morrissey v. Brewer*, 408 U.S. 471, 481, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (1972). On several prior occasions, we have supplemented the commitment procedures of RCW 71.05 to bring that statute into compliance with procedural due process guaranties. *In re Schuoler*, 106 Wn.2d 500, 510, 723 P.2d 1103 (1986); *In re Cross*, 99 Wn.2d 373, 662 P.2d 828 (1983); *In re Harris, supra*. In addition, we often interpret statutes in a manner which renders them constitutional. *State v. Browet, Inc.*, 103 Wn.2d 215, 219, 691 P.2d 571 (1984). Here, too, additional procedures are needed to ensure that the Statute is enforced fairly.

Therefore, we hold that a 72-hour hearing is required by the constitutional guaranty to due process, and must be

available to detainees under the Statute. While this requirement was not complied with here, it had no bearing on the ultimate outcome of petitioners' trials; thus the omission in this instance does not require reversal.

2. Less Restrictive Alternative.

Petitioners argue that the Statute violates equal protection because it does not require consideration of less restrictive alternatives to confinement. They point to the mental health statute, RCW 71.05, which requires consideration of such alternatives as a precursor to confinement. *See* RCW 71.05.240, .320.

 We agree. The State cannot provide different procedural protections for those confined under the sex predator statute unless there is a valid reason for doing so. Here, the State offers no justification for not considering less restrictive alternatives under RCW 71.05, and denying the same under RCW 71.09. Not all sex predators present the same level of danger, nor do they require identical treatment conditions. Similar to those committed under RCW 71.05, it is necessary to account for these differences by considering alternatives to total confinement. We therefore hold that equal protection requires the State to comply with provisions of RCW 71.05 as related to the consideration of less restrictive alternatives.

Less restrictive alternatives were not considered in either Young's or Cunningham's respective trials. Given our resolution in Cunningham's case, we are concerned only with the effect of this holding in regard to Young. We remand Young's case for consideration of alternatives to confinement. Because the sex predator determination has already been made, the finder of fact need only consider if the less restrictive alternatives are appropriate.

3. Jury Verdict and Selection.

Petitioners claim that the Statute provides an inadequate burden of proof by failing to require a unanimous verdict. The Statute is silent on the issue, but we believe that it

must be construed to afford an individual the right to a unanimous 12-person verdict.

██ ██ Our primary goal in interpreting statutes is to carry out the intent of the Legislature. *Anderson v. O'Brien*, 84 Wn.2d 64, 67, 524 P.2d 390 (1974). The sexually violent predator Statute requires the State to prove beyond a reasonable doubt that the person is a sexually violent predator. RCW 71.09.060(1). The Legislature's use of the "beyond a reasonable doubt" standard suggests an acute awareness of the need for heightened procedural protections in these proceedings. Moreover, in Washington, the beyond a reasonable doubt standard generally requires a unanimous verdict. *See State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984). Considering the context normally associated with this high burden of proof, *State v. Elgin*, 118 Wn.2d 551, 556, 825 P.2d 314 (1992), we find that the Legislature included the need for a unanimous verdict when it required "proof beyond a reasonable doubt" in the statutory scheme.

Here, over defense objections, the jury in Cunningham's trial was not instructed that unanimity was required, and an 11-to-1 verdict was returned — at least one person on the jury felt that the State failed to meet its burden. Under the standards announced here, the verdict was insufficient. In Young's case, the verdict was unanimous, and the jury's finding is affirmed.

Petitioners also contend that they are entitled to 12 peremptory challenges at trial. Young requested the additional challenges at a pretrial hearing. The trial court refused, and apparently gave three challenges to each side, plus an additional challenge to be used for the alternate seat. Cunningham also requested additional challenges. The trial court granted six challenges per side plus one for each alternate. Neither petitioner claims that he was prejudiced by the allegedly insufficient number of challenges; indeed, neither petitioner even submits the record of voir dire.

██ Petitioners argue that because the Statute subjects them to indefinite incarceration, they should be afforded the same number of peremptory challenges as defendants in cap-

ital cases under CrR 6.4. We disagree. The proceedings here are civil, not criminal, in nature. Thus, the appropriate number of challenges is found in RCW 4.44.130, which deals with civil juries: "Each party shall be entitled to three peremptory challenges". *See also* 14 Lewis H. Orland & Karl B. Tegland, Wash. Prac., *Trial Practice Civil* § 206, at 334 (4th ed. 1986). This is the same number of peremptory challenges allowed in RCW 71.05 civil commitment proceedings. *See* MPR 3.4(a). Therefore, three peremptory challenges are sufficient.

4. Vagueness.

Petitioners and amicus American Civil Liberties Union argue that various terms in the Statute — such as "comparable", "sexually motivated", "safe to be at large", "mental abnormality", and "likely" — are unconstitutionally vague.

> The issue of vagueness involves the procedural due process requirements of fair notice of the conduct warranting detention and clear standards to prevent arbitrary enforcement by those charged with administering the applicable statutes.

*In re LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986) (citing *Hontz v. State*, 105 Wn.2d 302, 308, 714 P.2d 1176 (1986); *see also Clyde Hill v. Roisen*, 111 Wn.2d 912, 916, 767 P.2d 1375 (1989). Exact specificity is not required; rather, the language used must be susceptible to understanding by persons of ordinary intelligence. *Seattle v. Eze*, 111 Wn.2d 22, 26-27, 759 P.2d 366, 78 A.L.R.4th 1115 (1988). We do not find the Statute to be so vague as to deny due process.

Ample standards are present to guide the exercise of discretion and to provide notice to potential detainees of prohibited conduct. The Statute is quite specific and explicit. It requires that a person "who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence", RCW 71.09-.020(1), as determined at a jury trial if so requested, RCW 71.09.050, be committed to the custody of DSHS for care and treatment. RCW 71.09.060. The definitional section sets out precise standards, and defines "mental abnormality". RCW 71.09.020(2). As the record indicates, the experts who testified at the commitment trials adequately explained and gave

meaning to this term within a psychological context. *E.g.*, CPY (Feb. 2, 1991), at 159-60; CPC (May 5, 1991), at 54-65. Likewise, the term "personality disorder" has a well-accepted psychological meaning. *See DSM-III-R*, at 335-58. The application of these standards to a particular set of facts is, of course, a determination for the factfinder, but the definitions provide sufficient guidance to do so properly.

Similar challenges based on vagueness have been rejected. The United States Supreme Court, in analyzing a sexual psychopath statute, held that the statute was not vague because it could be applied only to a narrowly defined group of offenders. *Minnesota ex rel. Pearson v. Probate Court*, 309 U.S. 270, 274-75, 84 L. Ed. 744, 60 S. Ct. 523, 126 A.L.R. 530 (1940). The statute there turned on "underlying conditions, calling for evidence of past conduct pointing to probable consequences . . . as susceptible of proof as many of the criteria constantly applied in prosecutions for crime." *Pearson*, at 274. Similarly, our Statute calls for particular evidence of past conduct and a propensity toward violence. *See also People v. Pembrock*, 62 Ill. 2d 317, 342 N.E.2d 28 (1976). The sex predator Statute is not so vague that it denies due process.

5. Right To Remain Silent.

Petitioners argue that they were denied their right to remain silent. Both were ordered by the trial court to speak to the State's psychologists. In addition, testimony was allowed at trial that Young refused to abide by the court's order. First, petitioners claim that the Fifth Amendment privilege against self-incrimination should apply to them. Second, they argue that because persons committed under the involuntary commitment act, RCW 71.05, have a right to remain silent, application of equal protection to the Statute compels this court to find that sexually violent predators possess that same right.

██ ██ Under the Fifth Amendment, no person "shall be compelled in any criminal case to be a witness against himself". The Supreme Court has not entirely limited application of the Fifth Amendment privilege to criminal cases. *See*,

*e.g., Boyd v. United States*, 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524 (1886). However, the Court has refused to apply the privilege to civil cases unless it has been shown conclusively that the penalty imposed is punishment tantamount to a criminal sanction. *United States v. Ward*, 448 U.S. 242, 254, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980). More to the point, in assessing the Illinois statute, found above to be significantly similar to RCW 71.09, the Supreme Court held that the Fifth Amendment does not apply. *Allen v. Illinois*, 478 U.S. 364, 375, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986). Where, as here, "the State serves its purpose of *treating* rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment", the action is not a "criminal case" for purposes of the privilege against compulsory self-incrimination. *Allen*, at 373-74.[15]

Furthermore, we see good reasons to refuse the statutory right to remain silent to sexually violent predators even though the Legislature has granted such a right to the mentally ill. Equal protection requires that similarly situated persons be treated alike. *In re Knapp*, 102 Wn.2d 466, 473, 687 P.2d 1145 (1984). However, sexually violent predators are not similarly situated to the mentally ill in regard to the treatment methods employed, or the information necessary to ensure that they receive proper diagnosis and treatment. The Legislature made specific findings which are pertinent to this distinction:

> [A] small but extremely dangerous group of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for the existing involuntary treatment act, chapter 71.05 RCW . . .. [S]exually violent predators generally have antisocial personality features which are unamenable to existing mental illness treatment modalities and those features render them likely to engage in sexually violent behavior. . . . The legislature further finds that the prognosis

---

[15]Of course, detainees could not be compelled to incriminate themselves by answering questions about prior uncharged or unconvicted criminal behavior. *See State v. Post*, 118 Wn.2d 596, 610-11, 826 P.2d 172, 837 P.2d 599 (1992).

for curing sexually violent offenders is poor, . . . and the treatment modalities for this population are very different than the traditional treatment modalities for people appropriate for commitment under the involuntary treatment act.

RCW 71.09.010. The problems associated with the treatment of sex offenders are well documented, and have continued to confound mental health professionals and legislators. The mental abnormalities or personality disorders involved with predatory behavior may not be immediately apparent. Thus, their cooperation with the diagnosis and treatment procedures is essential.[16] *See also Heller*, 125 L. Ed. 2d at 274 ("the different treatment to which a committed individual is subjected provides a rational basis"); *Bailey v. Gardebring*, 940 F.2d 1150, 1153 (8th Cir. 1991) (no constitutional right is violated when persons who suffer from severe mental disorders are treated differently from persons with less serious disorders), *cert. denied*, 112 S. Ct. 1516 (1992); *People v. Parrott*, ___ Ill. App. 3d ___, 613 N.E.2d 305, 310 (1993) (When individual is committed using "beyond a reasonable doubt" standard, "he was not more harshly treated than other persons whose commitment rests upon a finding of mental illness by clear and convincing evidence".).

## V
### EVIDENTIARY ISSUES

1. Prior Crimes.

Petitioners contend that several of the State's witnesses should not have been allowed to testify, and that other testimony was admitted in error. They claim that all the testimony of the victims of their prior crimes should have been excluded, as it was irrelevant and unfairly prejudicial. In

---

[16]Our rejection of petitioners' claim to a right to remain silent resolves several additional issues. First, petitioners claim that expert opinion testimony was based on statements obtained in violation of petitioners' right to remain silent. Second, petitioners assert that they have the unequivocal right to testify without notifying the State in advance. Because these proceedings are civil in nature, and because petitioners have no absolute right to remain silent, these contentions are without merit. Moreover, since we reverse the verdict against Cunningham, we need not consider the State's argument made on cross appeal, that the admission of his testimony despite discovery violations was in error.

addition, they argue that the victims' testimony pertaining to their emotional state at the time of the crimes should have been excluded as unfairly prejudicial. Cunningham argues separately that evidence relating to his juvenile conviction should have been excluded. Young claims that testimony about his 1972 bomb threat conviction was inadmissible.

Generally, all relevant evidence is admissible and all irrelevant evidence is inadmissible. ER 402. Relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". ER 401. Even relevant evidence will be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice". ER 403. The determination of relevance is within the broad discretion of the trial court, and will not be disturbed absent manifest abuse of that discretion. *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991).

The evidence here was properly admitted. The manner in which the previous crimes were committed has some bearing on the motivations and mental states of the petitioners, and is pertinent to the ultimate question here. Moreover, the likelihood of continued violence on the part of petitioners is central to the determination of whether they are sexually violent predators under the terms of the Statute. Thus, we cannot say that the trial court abused its discretion in admitting the victims' testimony. Although we agree that the testimony presented by the victims was compelling, and, therefore, had a substantial effect on the jury, we do not believe that its prejudicial effect outweighed its probative value. In assessing whether an individual is a sexually violent predator, prior sexual history is highly probative of his or her propensity for future violence.

In a similar vein, the trial court acted within its discretion when it admitted evidence of Cunningham's sexually motivated juvenile conviction. A person's history of sexually violent offenses is relevant to the sex predator determi-

nation. RCW 71.09.020(1). By using the word "offense", the Legislature indicated an intent to include prior juvenile adjudications within the scope of permissible proof at sex predator proceedings. *See In re A,B,C,D,E*, 121 Wn.2d 80, 87, 847 P.2d 455 (1993).

We do not, however, perceive any relevance to the testimony presented about Young's 1972 conviction for a bomb threat. The threat was made on a college campus where Young was a student. No sexual motivation was alleged for this crime. On the other hand, it is hard to conceive of any juror attaching much significance to the conviction in light of Young's prior history of violent sex offenses, which includes at least six felony rapes. The jury instructions make it clear that only sex offenses or sexually motivated felonies are considered in making the sex predator determination. Any error was harmless.

2. Validity of Prior Convictions.

Young contends that all evidence relating to his conviction in 1963 for four rapes should have been excluded because the jury instructions given there were in error. We disagree. The trial court properly held that the convictions were admissible.[17]

█ We have previously held that the State may use prior convictions without proving their constitutional validity in appropriate circumstances. *State v. Ammons*, 105 Wn.2d 175, 187, 713 P.2d 719, 718 P.2d 796, *cert. denied*, 479 U.S. 930 (1986). Because an individual subject to civil commitment would have no greater constitutional protections in this regard, we apply the *Ammons* case by analogy. In sentencing proceedings, the court has established the following rule:

> [A] prior conviction which has been previously determined to have been unconstitutionally obtained or which is constitutionally invalid on its face may not be considered. Constitutionally

---

[17]Although a habeas corpus petition is currently being considered on its merits, the judgment and sentence are facially valid, *see* ER 803(a)(22), and have been affirmed on appeal. *State v. Young*, 65 Wn.2d 938, 400 P.2d 374, *cert. denied*, 382 U.S. 963 (1965).

> invalid on its face means a conviction which without further elaboration evidences infirmities of a constitutional magnitude.

(Citations omitted.) *Ammons*, at 187-88. To hold otherwise would require appellate review of all prior convictions, which would "unduly and unjustifiably overburden the [trial] court". *Ammons*, at 188.

Finally, Young contends that the testimony of interrogating officers concerning his confessions to the rapes was wrongly admitted. He argues that because tape recordings were made (but not offered into evidence) the testimony must be excluded. Furthermore, he asserts that he should have been permitted to offer impeachment evidence of a criminal trespass charge and disciplinary history against the officers. These arguments are patently meritless.

3. <u>Expert Testimony.</u>

Petitioners argue that the testimony of the State's expert witnesses, Dr. Dreiblatt and Dr. Rawlings, should have been excluded because they testified as to theories which are not generally accepted in the scientific community. They contend that the experts had no basis for their testimony that any particular mental abnormality or personality disorder exists which makes a person likely to rape, or that Young or Cunningham was in fact likely to re-offend. They are supported in this claim by amicus, the Washington State Psychiatric Association. We conclude that the testimony was properly admitted.

Petitioners point to testimony offered by their own experts that rape is not necessarily caused by mental illness or disease. At trial, the jury heard a broad spectrum of evidence pertaining to the petitioners' condition. In addition to the State's expert testimony presenting the diagnoses of petitioners, the jury heard testimony from experts presenting the contrary view. From this evidence relating both to the accuracy of the diagnosis in general, and the specific criticism of the diagnoses made in Young's and Cunningham's cases, the jury was able to return a verdict that petitioners were sexually violent predators.

█ Initially, we must determine "if the evidence in question has a valid, scientific basis". *State v. Cauthron*, 120 Wn.2d 879, 887, 846 P.2d 502 (1993). The standard for determining if evidence based on novel scientific procedures is admissible is that set forth in *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923) (rejecting precursor to the modern polygraph test). The rule is well established:

> [E]vidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.

*State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984) (rejecting hypnotically induced testimony). Under *Frye*, "[t]he core concern . . . is only whether the evidence being offered is based on established scientific methodology". *Cauthron*, at 889.

█ We have previously held that predictions of future dangerousness do not violate due process, despite the inherent uncertainties of psychiatric predictions. *In re Harris*, 98 Wn.2d 276, 280, 654 P.2d 109 (1982). Our reasoning there is convincing in this context as well:

> Petitioner's argument would eviscerate the entire law of involuntary commitment as well as render dubious the numerous other areas where psychiatry and the law intersect. There is no question the prediction of dangerousness has its attendant problems. . . .
> . . . But we are not prepared to abandon the possibility of conforming the law of involuntary civil commitment to the requirements of the constitution.

*Harris*, at 280-81. In addition, we have held that a finding of future dangerousness provides an appropriate reason to impose an exceptional sentence on a sex offender. *State v. Pryor*, 115 Wn.2d 445, 454, 799 P.2d 244 (1990). Our holding in *Pryor* implies that predictions of future dangerousness are sufficiently accurate and reliable. We see no reason to reconsider that holding here. *See State v. Janes*, 121 Wn.2d 220, 235, 850 P.2d 495 (1993) (independent *Frye* determination unnecessary when an analogous proposition has already been deemed admissible).

■ We are also not persuaded that the trial court erred in allowing the remainder of the experts' testimony. The sciences of psychology and psychiatry are not novel; they have been an integral part of the American legal system since its inception. Although testimony relating to mental illnesses and disorders is not amenable to the types of precise and verifiable cause and effect relation petitioners seek, the level of acceptance is sufficient to merit consideration at trial. As Justice White pointed out in *Foucha*, "such opinion is reliable enough to permit the courts to base civil commitments on clear and convincing medical evidence that a person is mentally ill and dangerous". 112 S. Ct. at 1783 n.3.

■ Our position is supported by the Legislature's determination, following numerous hearings, that the sexually violent predator condition is not only recognized, but treatable *and* capable of diagnosis. *See* RCW 71.09. As Justice O'Connor pointed out in *Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S. Ct. 1780, 1789 (1992), the inherent uncertainty involved in making psychological judgments requires courts to " '. . . pay particular deference to reasonable legislative judgments' about the relationship between dangerous behavior and mental illness." (O'Connor, J., concurring) (quoting *Jones v. United States*, 463 U.S. 354, 365 n.13 (1983)).

■ Next, we must determine if expert testimony was properly admitted. ER 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The determination of whether expert testimony is admissible is within the discretion of the trial court. *State v. Ortiz*, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992). Unless there has been an abuse of discretion, this court will not disturb the trial court's decision.

The 2-part test we apply for ER 702 matters is whether: "(1) the witness qualifies as an expert and (2) the expert

testimony would be helpful to the trier of fact." *Cauthron*, at 890. Here, there is no dispute as to either of the State's experts' qualifications. Moreover, the expert testimony was certainly helpful to the trier of fact — psychiatric testimony is central to the ultimate question here: whether petitioners suffer from a mental abnormality or personality disorder.

In a related argument, Young claims that Dr. Dreiblatt's testimony that Young suffers from a *combination* of mental abnormality and personality disorder was insufficient to meet the definition of sexually violent predator. We disagree. The definition is phrased in the alternative and states that a sexually violent predator is someone who suffers from a mental abnormality *or* a personality disorder. RCW 71.09.020(1). We must construe it, however, in a manner which effectuates its purpose. *Wichert v. Cardwell*, 117 Wn.2d 148, 151, 812 P.2d 858 (1991). The Legislature intended that all dangerous sex offenders be incapacitated and treated. Frequently, as Young's case amply demonstrates, an individual will suffer from multiple mental abnormalities and personality disorders which make violent rape likely. It would thwart the legislative purpose if the Statute only allowed the commitment of those who suffer from one or the other, while prohibiting the commitment of more seriously afflicted sexually violent predators. Thus, the showing that Young suffers both a mental abnormality *and* a personality disorder meets the requirements of the Statute.

Petitioners also claim that the expert testimony should be excluded because it was based on hearsay. Under ER 703, an expert's opinion may be heard on materials "of a type reasonably relied upon by experts in the particular field". Both experts for the State here relied on psychological reports and criminal history of petitioners. They testified that these are the types of materials reasonably relied on to diagnose future dangerousness of sex offenders. Indeed, in the face of petitioners' refusals to cooperate, no other course was open to the State's experts.

Finally, it must be pointed out that petitioners each presented expert testimony of their own. The juries were urged

by defense experts to reject the opinions of the State's experts, and had ample opportunity to weigh the testimony of both sides. The ultimate decision of whether or not petitioners were sexually violent predators was made by the factfinder only after a thorough presentation of the experts' views.

## VI
### CONCLUSION

In sum, we conclude that the overall statutory scheme presented in the sexually violent predator portions of the Act is constitutional. We hold that RCW 71.09 is civil rather than criminal, and does not violate either the prohibition against ex post facto laws or the double jeopardy clause. We further hold, after a searching inquiry, that the basic statutory scheme implicates no substantive due process concerns. Although we conclude that a detainee must be permitted to appear in court within 72 hours to contest probable cause, the failure to accord petitioners this right was harmless error.

We conclude that the Statute is not void for vagueness; the terms are sufficiently specific and explicit. Further, due process does not operate to guarantee petitioners a right to remain silent; there are ample reasons to treat these detainees differently than others involuntarily committed. As to the remaining evidentiary issues, in most instances the trial courts acted properly within their discretion. The testimony of the victims of previous sexual crimes, including any juvenile offenses, is relevant and may be admitted. The expert testimony was also properly admitted. We hold that the evidence pertaining to a bomb threat conviction in Young's case was inadmissible, but that error was harmless. Finally, we have given ample consideration to all of the remaining arguments raised in the personal restraint petitions and on appeal, as well as those advanced by amici, and conclude that they lack merit.

Turning to the specific disposition in petitioners' cases, we reverse Cunningham's commitment due to the State's failure to prove dangerousness through evidence of a recent

overt act. Also, the commitment was in error because the jury was not unanimous. We affirm the sex predator determination in petitioner Young's case, but remand solely for a consideration of less restrictive alternatives.

ANDERSEN, C.J., and BRACHTENBACH, DOLLIVER, GUY, and MADSEN, JJ., concur.

JOHNSON, J. (dissenting) — I dissent.

[I]ncarceration of persons is . . . one of the most feared instruments of state oppression and . . . freedom from this restraint is essential to the basic definition of liberty in the Fifth and Fourteenth Amendments . . ..[18]

The sexually violent predator statute, RCW 71.09 (hereinafter Statute), is a well-intentioned attempt by the Legislature to keep sex predators off the streets. However, by authorizing the indefinite confinement in mental facilities of persons who are not mentally ill, the Statute threatens not only the liberty of certain sex offenders, but the liberty of us all. By committing individuals based solely on perceived dangerousness, the Statute in effect sets up an Orwellian "dangerousness court", a technique of social control fundamentally incompatible with our system of ordered liberty guaranteed by the constitution and contrary to the recent United States Supreme Court decision in *Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992).

History has proven the grave error in creating special classes of individuals for whom constitutional rights are diminished. Today the majority condones the Legislature's creation of such a special class, trampling these individuals' rights. I cannot agree. The Statute is nothing more or less than a preventive detention scheme based on allegations of future dangerousness. Once a person has committed a sexually motivated crime, no matter how remote in time or place,

---

[18]*Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S. Ct. 1780, 1791 (1992) (Kennedy, J., dissenting).

the State is authorized to hold that person forever for the "good of the community". Our community would be better served by steadfast adherence to constitutional principles.

The majority concedes the unconstitutionality of the Statute and attempts to salvage it by reading in requirements not included by the Legislature. Unfortunately, the majority's pen stops short. Under *Foucha*, the State must prove an individual is *both* mentally ill and dangerous before the person can be involuntarily committed; however, the Statute still fails to meet the mental illness requirement. Thus, the Statute offends the due process clause by subjecting individuals to lifetime confinement based not on any crime committed, but instead on fears of future crimes, and it offends the prohibitions against ex post facto laws and double jeopardy by masquerading as a civil commitment law when its purpose is penal.

I

SUBSTANTIVE DUE PROCESS

The sexual predator Statute violates substantive due process. Under the Fifth and Fourteenth Amendments, no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. 5; U.S. Const. amend. 14, § 1. "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 106 S. Ct. 662, 106 S. Ct. 677 (1986)). The test to be applied in determining the constitutionality of a statute under substantive due process depends upon whether a fundamental right is at stake.

An individual's liberty interest is fundamental in nature. *See United States v. Salerno*, 481 U.S. 739, 750, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action". *Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S.

Ct. 1780, 1785 (1992); *Reno v. Flores*, ___ U.S. ___, 123 L. Ed. 2d 1, 113 S. Ct. 1439, 1454 (1993) (O'Connor, J., concurring). Physical confinement in a mental institution entails a "massive curtailment of liberty". *Vitek v. Jones*, 445 U.S. 480, 491-92, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980).

When a statute implicates a fundamental right such as a person's liberty, the test for whether the statute passes constitutional muster is one of strict scrutiny. For the statute to be constitutional, it must further a compelling state interest and must be narrowly tailored to achieve that interest. *State v. Farmer*, 116 Wn.2d 414, 429, 805 P.2d 200, 812 P.2d 858, 13 A.L.R.5th 1070 (1991); *In re Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986).

Although the majority acknowledges the Statute must pass strict scrutiny, it fails to adequately analyze whether the Statute is narrowly tailored to achieve the State's interest. The most recent statement of the Supreme Court's requirements for narrowly tailoring an involuntary commitment statute is *Foucha v. Louisiana*, ___ U.S. ___, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992). The majority has failed to see or has chosen to ignore that *Foucha* provides a framework for substantive due process analysis in these types of cases. *Foucha* recognizes only three situations in which the State has such a compelling interest in public safety that a complete deprivation of an individual's liberty interest is justified: criminal conviction, civil commitment, and limited detention of persons shown to be dangerous to the community. *Foucha*, 112 S. Ct. at 1785-86.

Even in these three situations, however, the State is required to narrowly tailor its statutes. For example, the requirement that a person be both mentally ill and dangerous is a way to constitutionally tailor civil commitment statutes. In addition, strict time limits for pretrial detention are another specific way to narrow the conditions under which an individual may be confined.

In contrast, the sexual predator Statute is not narrowly tailored to achieve its compelling interest. In order to be narrowly drawn, the Statute must satisfy certain require-

ments set out by the United States Supreme Court for either civil commitment or preventive detention statutes. The sex predator Statute fails on both counts.

Under civil commitment, substantive due process requires that an individual be both mentally ill and dangerous before he or she may be involuntarily committed. *Foucha*, 112 S. Ct. at 1784. In *Foucha*, an insanity acquittee who had regained his sanity sought release from a mental institution. Foucha was found to be no longer mentally ill, but still dangerous to others because of his "antisocial personality, a condition that is not a mental disease and . . . is untreatable". *Foucha*, 112 S. Ct. at 1782. The Court held that Foucha's continued confinement based on dangerousness alone violated due process. *Foucha*, 112 S. Ct. at 1784.

Like the statute in *Foucha*, RCW 71.09 violates substantive due process because it requires only dangerousness and not mental illness as a prerequisite to commitment. The Statute, by its own terms, applies specifically to individuals who "do not have a mental disease or defect that renders them appropriate for the existing involuntary treatment act". RCW 71.09.010.

The Statute provides for the indefinite commitment of any person deemed to be a "sexually violent predator", but the Statute's definition of this term does not apply to a group of individuals who are mentally ill in any medically recognized sense. *See* La Fond, *Washington's Sexually Violent Predator Law: A Deliberate Misuse of the Therapeutic State for Social Control*, 15 U. Puget Sound L. Rev. 655, 691-92 (1991-1992); Comment, *Sexual Violence, Sanity, & Safety: Constitutional Parameters for Involuntary Civil Commitment of Sex Offenders*, 15 U. Puget Sound L. Rev. 879, 898-900 (1991-1992).

The Statute defines "sexually violent predator" as any person who meets the following two criteria: (1) the person must at any time in his or her life been either charged with or convicted of a sexually violent crime; and (2) the person must suffer from "a *mental abnormality* or *personality disorder* which makes the person likely to engage in predatory

acts of sexual violence". (Italics mine.) RCW 71.09.020(1). The second criterion involves a prediction of dangerousness based on a "mental abnormality" or "personality disorder", but these two terms do not involve any medically recognized mental illness.

Amicus, the Washington State Psychiatric Association, points out the term "mental abnormality" has no clinically significant meaning and no recognized diagnostic use; the term "abnormality" has long been in disuse because it can have a variety of different meanings. The Statute defines the term "mental abnormality" as:

> a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the person to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others.

RCW 71.09.020(2). A "mental abnormality" which makes a person "likely to engage in predatory acts of sexual violence" is thus defined by the Statute as a mental condition that may predispose a person to commit a sex crime. RCW 71.09-.020(1), (2). This definition is merely circular, and, as one commentator has observed, allows a "mental abnormality" to be established in a circular manner: the "abnormality" will be derived from the person's past sexual behavior, and this in turn will be used to establish the person's predisposition to future dangerous sexual behavior. Wettstein, *A Psychiatric Perspective on Washington's Sexually Violent Predators Statute*, 15 U. Puget Sound L. Rev. 597, 602, 633 (1991-1992) (concluding the Statute's definition of "sexually violent predator" fails to coincide with clinical or empirical knowledge regarding sex offenders). *See also* Rideout, *So What's in a Name? A Rhetorical Reading of Washington's Sexually Violent Predators Act*, 15 U. Puget Sound L. Rev. 781, 793 (1991-1992) (discussing the tautology "in the statement that sexually violent predators have features that lead to sexually violent behavior").

The Statute also does not provide a definition for the term "personality disorder". Amicus points out this term has a

clinically recognized meaning, but there is no "personality disorder" specific to sex offenders. Because of this problem, the task of determining whether a causal relationship exists between a "personality disorder" and the person's potential dangerousness is nothing more than "a matter of speculation or meaningless circularity". Wettstein, 15 U. Puget Sound L. Rev. at 603; *see also* Comment, *Washington's Sexually Violent Predator Law: The Need To Bar Unreliable Psychiatric Predictions of Dangerousness From Civil Commitment Proceedings*, 39 U.C.L.A. L. Rev. 213 (1991-1992).[19]

Despite some psychiatric incantations, therefore, the sexual predator Statute deals with potentially dangerous people, but not mentally ill people. Because under *Foucha* a prediction of dangerousness alone is an unconstitutional basis for indefinite confinement in a mental institution, the Statute violates due process.

Even if a personality disorder or mental abnormality is a mental illness, this court has previously required proof of a recent overt act as evidence of dangerousness before a person can be detained to assess whether he or she is mentally ill. *See In re Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982). The plain language of the sex predator Statute contains no such requirement.[20] The majority attempts to salvage the Stat-

---

[19]The majority chides the dissent for relying on a handful of law review articles in support for the claim that a "mental abnormality" or "personality disorder" does not constitute "mental illness" as required by *Foucha*. Majority, at 33 n.10. It is curious that the majority also relies on a law review article in support of its proposition that the Statute's terms do constitute "a number of recognized mental pathologies", *i.e.*, mental illness. See majority, at 28. It is also curious that, after concluding the statute requires a showing of mental illness, the majority states in its equal protection analysis, "there are good reasons to treat *mentally ill people* differently than *violent sex offenders*". (Italics mine.) Majority, at 44-45. The majority cannot have it both ways.

[20]To commit a person under the Statute, the State is required to reprove the defendant committed a prior crime and to present an evaluation by a psychologist establishing the person is likely to reoffend. However, this "evaluation" is often based merely on a review of the police reports and prior psychological evaluations rather than on a personal interview with the defendant.

ute's constitutionality by reading in a requirement of a recent overt act, but *only* for individuals who have been released into the community. For individuals currently incarcerated, no evidence of a recent overt act is required.

This judicial rewriting of the Statute is unprincipled decisionmaking at its worst. Although the majority is correct that a court must construe a statute to render it constitutional, majority at 41, *a court cannot rewrite a statute by reading into it language that simply is not there. Addleman v. Board of Prison Terms & Paroles*, 107 Wn.2d 503, 509, 730 P.2d 1327 (1986) (stating a court may not "read into a statute those things which it conceives the Legislature may have left out unintentionally"); *In re Taylor*, 105 Wn.2d 67, 69, 711 P.2d 345 (1985) (stating if language of a statute is clear, a court may not "read things into it which are not there"). Such judicial rewriting is not only unprincipled, but also unfair. The parties could not have anticipated this new construction and have not had an opportunity to brief or argue the constitutionality of the majority's new version of the Statute.

The court's wholesale reading in of an overt act requirement also runs counter to the Legislature's intent. The Statute was enacted in response to intense public outcry over two brutal sex crimes: the rape and mutilation of a Tacoma boy, and the rape and murder of a Seattle woman. *See* Boerner, *Confronting Violence: In the Act and in the Word*, 15 U. Puget Sound L. Rev. 525 (1991-1992). The individuals who committed the crimes had recently been released after serving time for previous sex crimes. To the extent that the majority now requires evidence of a recent overt act by such released individuals, the majority paves the way for a repeat of the above brutal crimes, which is exactly what the legislation was enacted to avoid! This is an absurd result.

Finally, the majority's rewriting of the Statute raises new equal protection concerns. By reading in this new requirement, the court creates two classes of persons under the same statute: those incarcerated versus those who are not. This is a distinction without a difference. Immediately upon

release, an individual must now commit an overt act to be incarcerated under the Statute, whereas the day before release, the same individual could be committed without proof of an overt act. This new distinction is arbitrary, violating even a rational basis review.

Equal protection requires that "persons similarly situated with respect to the legitimate purposes of the laws receive like treatment". *In re Knapp*, 102 Wn.2d 466, 473, 687 P.2d 1145 (1984). The purpose of the Statute is to prevent sexual predators from reoffending and thereby protect the community. It is difficult to see the difference between an individual the day before he or she leaves prison versus an individual the day after departing from jail. The only rationale offered by the majority is that an incarcerated individual does not have the opportunity to commit a recent overt act. I disagree. Evidence amounting to a "recent overt act" is often present even while in jail. Such evidence could be based on prison activities or conduct, such as inappropriate drawings of sexual encounters with children.

The court cannot choose to have two standards for commitment: one for those presently incarcerated and another for everybody else.[21] The United States Supreme Court has been careful to harmonize the constitutional requirements for *civil* commitment in the ordinary situation with those arising when there has been a finding of insanity at a *criminal* trial. *See Jones v. United States*, 463 U.S. 354, 77 L. Ed. 2d 694, 103 S. Ct. 3043 (1983). Although the majority's requirement of a recent overt act by released individuals harmonizes RCW 71.09 with the State's short-term detention statute, RCW 71.05,[22] this requirement does not render the Statute con-

---

[21]The majority implies that *Heller v. Doe*, ___ U.S. ___, 125 L. Ed. 2d 257, 113 S. Ct. 2637 (1993) authorizes a 2-tier civil commitment process. Majority, at 44 n.14. *Heller* is inapt, however, for two reasons: first, the Court did not review the Statute under a heightened scrutiny standard, and second, it deals with mentally retarded, not mentally ill, persons.

[22]The majority also reads into RCW 71.09 a requirement from RCW 71.05, which requires the State to consider less restrictive alternatives as a precursor to confinement. Majority, at 47. Although perhaps a good idea, the majority's rewrit-

stitutional. Under the majority's interpretation, incarcerated individuals still face the potential for lifetime detention based only on the possibility of future dangerousness. Because incarceration under the Statute can follow a long prison term and because the majority does not require a recent overt act for these individuals, the determination that they are "dangerous" is not even based on the same standard used for others who are civilly committed. If an individual once committed a sex crime and someone thinks that individual is still dangerous, the Statute authorizes a lifetime term in a mental facility. This is pure preventive detention.

The United States Supreme Court has permitted preventive detention only in the pretrial context and only if the duration of confinement is *strictly limited,* not indefinite as in this case. *See, e.g., United States v. Salerno,* 481 U.S. 739, 747-51, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987); *Schall v.*

---

ing of the Statute is still inappropriate for the same reasons discussed above. By reading in these new requirements, the court transforms RCW 71.09 into a statute that looks more like RCW 71.05, and thereby frustrates the Legislature's manifest intent to create a *new* statutory scheme since RCW 71.05 was deemed to be inadequate. *See* RCW 71.09.010.

Moreover, the majority's treatment of the equal protection question is inconsistent with its treatment of due process. In explaining why the incarceration of sexual predators within correctional institutions comports with due process, the majority implies that no less restrictive alternatives would effectively address the problem of preventing sex offenders from committing further crimes. The majority states:

> Given the nature of sexually violent predators, it would not be safe to house them in a less secure setting. . . .
>
> . . . .
>
> . . . Here, the dangerousness of committed sex predators justifies a secure confinement facility.

Majority, at 34-35. Yet with respect to equal protection, the majority concludes that the State has proffered no "valid reason" for treating sexually violent predators differently from persons committed under RCW 71.05. Majority, at 47.

It is also incorrect to aver that the State has put forth no justification for the disparate treatment of sexually violent predators under RCW 71.09. In this regard, the majority again flaunts the express intent of the Legislature, which found that:

> [T]he treatment modalities for [sexually violent predators] are very different than the traditional treatment modalities for people appropriate for commitment under the involuntary treatment act.

RCW 71.09.010.

*Martin*, 467 U.S. 253, 264-71, 81 L. Ed. 2d 207, 104 S. Ct. 2403 (1984); *Jackson v. Indiana*, 406 U.S. 715, 738, 32 L. Ed. 2d 435, 92 S. Ct. 1845 (1972).

In *Salerno*, the Supreme Court upheld a federal act authorizing pretrial detention of defendants deemed dangerous. The Court noted that preventive detention under the act was "limited by the stringent time limitations of the Speedy Trial Act". *Salerno*, 481 U.S. at 747. In *Schall*, the Court upheld a state statute authorizing the preventive pretrial detention of juveniles accused of crimes who were deemed dangerous, and the Court noted the maximum possible detention under the act was only 17 days. *Schall*, 467 U.S. at 269-70. Finally, in *Jackson*, the Court held that a criminal defendant who was incapable of proceeding to trial could be detained only for the reasonable period of time necessary to determine whether a substantial probability existed the defendant would ever become capable to proceed to trial. *Jackson*, 406 U.S. at 738. Under this standard, the Court in *Jackson* found the defendant's 3½-year confinement excessive because the defendant, a deaf mute, was not expected to ever gain the competency to stand trial.

The Supreme Court has never upheld a lifetime preventive detention scheme for those who are feared dangerous. It was asked to do precisely that in *Foucha*. The State of Louisiana argued that *Salerno* authorized preventive detention for persons who pose a danger to the community. *Foucha*, 112 S. Ct. at 1786. The Court disagreed and distinguished *Salerno* on three grounds. First, the Court noted the statute at issue in *Salerno* was narrowly focused on the most serious of crimes and required a finding that no conditions of release could reasonably assure the safety of the community. *Foucha*, 112 S. Ct. at 1786. Second, the Court contrasted the time limits for pretrial detention with the indefinite commitment authorized by the Louisiana law. *Foucha*, 112 S. Ct. at 1786-87. Finally, the Court pointed out that less restrictive alternatives were available to deal with persistent criminal behavior, including enhanced sentences for recidivists. *Foucha*, 112 S. Ct. at 1786-87.

Like the statute in *Foucha*, the sexual predator Statute is fundamentally flawed. Its scope is broad, covering everything from murder-rape to attempted sexually motivated burglary. Its duration is indefinite. Unlike *Salerno, Schall*, and *Jackson*, the Statute in this case produces lifetime preventive detention. The Legislature found that "sexually violent predators" are "unamenable to existing mental illness treatment modalities" and that the prognosis for curing them is "poor". RCW 71.09.010. The Statute thus creates a class of persons who, by definition, are not likely to be "cured", and thus not likely to ever be released.

As a result, the Statute does precisely what *Foucha* expressly says the government may not do: confine someone indefinitely as dangerous who is not mentally ill but simply has a personality disorder or antisocial personality. As the Supreme Court noted:

[T]he State asserts that because Foucha once committed a criminal act and now has an antisocial personality that sometimes leads to aggressive conduct, a disorder for which there is no effective treatment, he may be held indefinitely. This rationale would permit the State to hold indefinitely any other insanity acquittee not mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. *The same would be true of any convicted criminal, even though he has completed his prison term.*

(Italics mine.) *Foucha*, 112 S. Ct. at 1787. The Legislature has other options for dealing with sex offenders. Enhanced sentences for repeat offenders and supervised release are but two of the most obvious.

The sexual predator Statute has each of the constitutional weaknesses of the statute in *Foucha*, weaknesses that caused the Supreme Court to consider the *Foucha* statute

*only a step away from substituting confinements for dangerousness for our present system which, with only narrow exceptions ... incarcerates only those who are proved beyond a reasonable doubt to have violated a criminal law.*

(Italics mine.) *Foucha*, 112 S. Ct. at 1787. I would hold the sexual predator Statute is an unconstitutional violation of substantive due process.

## II
## Ex Post Facto and Double Jeopardy

In addition to violating substantive due process, the Statute's commitment provisions violate the constitutional prohibition against ex post facto laws. U.S. Const. art. 1, § 10. A law violates this prohibition if it "makes more burdensome the punishment for a crime, after its commission". *Collins v. Youngblood*, 497 U.S. 37, 42, 111 L. Ed. 2d 30, 110 S. Ct. 2715 (1990) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169, 70 L. Ed. 216, 46 S. Ct. 68 (1925)). The purpose of the ex post facto prohibition is to give individuals fair warning of the effect of legislative acts and to restrict the power of the State to impose arbitrary or vindictive legislation. *Weaver v. Graham*, 450 U.S. 24, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981).

The commitment provisions also violate the prohibition on double jeopardy. U.S. Const. amend. 5. The double jeopardy clause protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 89 S. Ct. 2072, 89 S. Ct. 2089 (1969). When the government has already imposed a criminal penalty, the double jeopardy clause precludes the government from seeking additional punishment in a second proceeding if it is dissatisfied with the sanction obtained in the first. *United States v. Halper*, 490 U.S. 435, 449-50, 104 L. Ed. 2d 487, 109 S. Ct. 1892 (1989).

Because RCW 71.09 authorizes retroactive extension of a criminal sentence if the State is dissatisfied with the original length, it violates both of these provisions. The majority argues that these provisions do not apply because the Statute is civil rather than criminal in nature. However, a statute must be deemed criminal in nature when the statute is "so punitive either in purpose or effect" as to negate a legislature's intent to establish a civil statute. *United States v. Ward*, 448 U.S. 242, 248, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980).

The factors to be considered in deciding whether a statute has a criminal or civil purpose include whether the act dis-

avows all interest in punishment, whether it provides treatment, and whether release is possible at any time. *Allen v. Illinois*, 478 U.S. 364, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986).

The statute in *Allen* allowed the State to divert persons charged with crimes from the criminal system to the civil system for treatment of mental illness. In contrast, the sexually violent predator Statute is not an alternative to criminal imprisonment. It allows the State to seek a criminal conviction against an individual, and only after the individual has completed his or her sentence does the Statute purportedly seek to provide specialized "care and treatment" for the individual. *See* RCW 71.09.030, .060. Far from disavowing criminal punishment, such punishment is an essential component of the Statute's commitment provisions.

Although the Statute provides for treatment, this goal is completely subordinated to punishment. An individual's need for diagnosis and treatment is *never* sufficiently compelling under the Statute until the individual is nearing the end of his or her criminal sentence. The timing alone is a strong indication that the Legislature was less interested in treatment than in confinement.

While both the Illinois statute in *Allen* and the Washington Statute provide for an indefinite period of confinement, there are important procedural differences. In Illinois, an individual may file a petition for release at any time and is entitled to a case review every 6 months. The court is required to hear all petitions. Here a petition for release normally must be authorized by the Department of Social and Health Services. Although an individual may petition over the Department's objection, he or she must then prevail at a show cause hearing in order to obtain a trial. Once a person has petitioned over the Department's objection and been denied, the court is mandated to deny subsequent petitions unless the person can make a showing of changed circumstances in the petition itself. Case reviews are conducted only once a year.

Based on a comparison of these factors, RCW 71.09 is punitive in purpose and effect. Therefore, the prohibitions against ex post facto laws and double jeopardy apply here, and the Statute is unconstitutional.

In conclusion, I would hold that Washington's sexually violent predator Statute, RCW 71.09, violates petitioners' rights to substantive due process and violates the constitutional prohibition against ex post facto laws and double jeopardy.

UTTER and SMITH, JJ., concur with JOHNSON, J.

Reconsideration denied September 20, 1993.