FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 JAN 13 AM 8: 51

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re Detention of: | ) | NO. 68579-1-I |
| | ) | |
| CLAY PARSONS, | ) | DIVISION ONE |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| v. | ) | |
| | ) | FILED: January 13, 2014 |
| CLAY PARSONS, | ) | |
| Appellant. | ) | |

LAU, J. — Clay Parsons challenges his commitment as a sexually violent predator (SVP) under chapter 71.09 RCW. Because the trial court properly determined the existence of probable cause before detaining Parsons for trial and did not err in granting Parsons' request to waive his presence at trial, we affirm.

## FACTS

Parsons was convicted of three sexually violent offenses that occurred during a three-month period in 1983: first degree rape, first degree kidnapping, and first degree burglary. One of the victims was a 12-year-old girl that Parsons abducted while she

was waiting for her school bus. In another incident, Parsons broke into a home and repeatedly fondled a woman while her husband slept next to her.

Parsons later admitted sexually assaulting dozens of additional victims, including his sisters and nieces, a 70-year-old woman, a 5-year-old boy, and his boss's daughter. Many of the incidents involved force or the threat of force.

Some of Parsons' sexual offenses occurred while he was in the Marines and stationed in California and in Japan from 1982-1983. During this period, Parsons admitted planning and carrying out numerous "military missions" in which he would cruise residential areas looking for potential victims. Parsons' "missions" eventually escalated, and he began entering homes and attempting to have sexual contact with female occupants.

Parsons was paroled on the 1983 crimes in 1988. About seven months later, he forced his way into a home and attempted to push a 10-year-old girl into a bedroom. The girl managed to escape, and Parsons was ultimately convicted of attempted first degree rape.

On February 2, 2010, as Parsons approached the release date for his 1989 sentence, the State filed a petition seeking his involuntary civil commitment as a sexually violent predator. In support of the petition, the State submitted a psychological evaluation dated January 27, 2010, from Will Damon, Ph.D. At the State's request, Henry Richards, Ph.D., prepared a second evaluation on February 1, 2010. Both Dr. Damon and Dr. Richards concluded that Parsons suffered from mental abnormalities that predisposed him to the commission of criminal sexual acts in a degree that constituted "a menace to the health and safety of others." RCW 71.09.020(8).

After considering Parsons' scores on several actuarial instruments, dynamic risk factors, and Parsons' recent participation in sex-offender treatment, Dr. Damon concluded that Parsons did not pose the necessary likelihood of reoffending to meet the criteria for commitment. Relying on essentially the same actuarial instruments and dynamic risk factors, Dr. Richards concluded that Parsons posed a strong possibility of recidivism, "exceeding the 51 percent threshold for civil commitment."

At the probable cause hearing, Parsons asserted that the State was not authorized to obtain the second evaluation from Dr. Richards after the first evaluation by Dr. Damon. Parsons argued that based on Dr. Damon's risk assessment, the State had failed to establish probable cause and that the SVP petition must therefore be dismissed.

The trial court declined to rule on the propriety of the second evaluation, concluding that "even without Richards' report, there is a sufficient basis for probable cause." Report of Proceedings (RP) (May 20, 2010) at 22-23. The court denied Parsons' motion to dismiss and ordered him detained for trial.

Prior to trial, Parsons informed the court that he wanted to waive his right to be present, except for when the State called him as a witness. Over the State's objection, the court granted Parsons' request. On March 12, 2012, a jury found that Parsons was a sexually violent predator.

## ANALYSIS

Parsons contends that the trial court erroneously disregarded the substance of Dr. Damon's evaluation and misunderstood the relevant legal requirements for civil commitment under chapter 71.09 RCW. He argues that the trial court therefore erred in

-3-

determining the existence of probable cause and that the order of commitment must be reversed.

Relying on In re Pers. Restraint of Young, 122 Wn.2d 1, 857 P.2d 989 (1993), the State maintains that any errors in the probable cause determination were harmless because they had no effect on the ultimate outcome of the case. In Young, our Supreme Court held that detainees had a due process right under chapter 71.09 RCW to contest probable cause at an adversarial hearing. Young, 122 Wn.2d at 46-47. But the court rejected the detainees' claim that the failure to provide a hearing required a reversal of the commitment order: "While [the due process] requirement was not complied with here, it had no bearing on the ultimate outcome of petitioners' trial; thus the omission in this instance does not require reversal." Young, 122 Wn.2d at 47; see also In re Det. of Campbell, 139 Wn.2d 341, 352, 986 P.2d 771 (1999) (failure to hold probable cause hearing within 72 hours was harmless error where detainee failed to show any adverse effect on outcome of his case).

Here, Parsons did not seek discretionary review of the probable cause determination. The matter then proceeded to trial, and a jury found that he was a sexually violent predator. Parsons has not alleged or demonstrated that the probable cause determination had any effect on the trial or the jury's decision.

In any event, the trial court did not err in determining the existence of probable cause based on Dr. Damon's evaluation. Before detaining a person for a commitment trial under chapter 71.09 RCW, the trial court must first determine "whether probable cause exists to believe that the person named in the petition is a sexually violent predator." RCW 71.09.040(1). The purpose of the probable cause determination "is to

-4-

prevent wrongful detention during the 45-day evaluation period prior to the commitment trial." Campbell, 139 Wn.2d at 354. "Probable cause" exists if there are facts that, if believed, would lead a reasonable person to conclude, more likely than not, that the respondent is a sexually violent predator. See In re Det. of Petersen, 145 Wn.2d 789, 797, 42 P.3d 952 (2002).

When determining probable cause, the court may not "weigh and measure asserted facts against potentially competing ones." Petersen, 145 Wn.2d at 797. Nor may the court assess the credibility of an expert's opinion. In re Det. of Jacobson, 120 Wn. App. 770, 781, 86 P.3d 1202 (2004). We review the probable cause determination de novo. State v. McCuistion, 174 Wn.2d 369, 382, 275 P.3d 1092 (2012).

Parsons contends that the trial court erred in disregarding Dr. Damon's conclusion that he was not more likely than not to engage in predatory acts of sexual violence. But as defense counsel essentially conceded at the probable cause hearing, the trial court is not bound by an expert's conclusion. See State v. Toomey, 38 Wn. App. 831, 837, 690 P.2d 1175 (1984). Rather, the trial court is permitted to look at the facts in an expert's report "to decide whether they support the expert's conclusions." Jacobson, 120 Wn. App. at 780. The court then determines whether the evidence, if believed, establishes probable cause. Jacobson, 120 Wn. App. at 780.

Here, the trial court expressly relied on the facts set forth in Dr. Damon's report. Dr. Damon diagnosed Parsons as suffering from a "constellation" of mental abnormalities, including pedophilia, paraphilia NOS (not otherwise specified) nonconsent, alcohol dependence/cannabis abuse, and antisocial personality disorder. He concluded that these conditions predisposed Parsons to the commission of criminal

sexual acts "in a degree constituting ... a menace to the health and safety of others." RCW 71.09.020(8).

After identifying Parsons' mental abnormalities, Dr. Damon employed three actuarial instruments to assess Parsons' likelihood of reoffending: the revised Static-99 (Static-99R), the revised Static-2002 (Static-2002R), and the revised Minnesota Sex Offender Screening Tool (MnSOST-R). He then compared Parsons' scores with multiple sample groups and estimated his likelihood of reoffending, over a period of 5 to 15 years, as ranging from 25.2 percent to 42.6 percent. Parsons' score on the Hare Psychopathy Checklist, Revised, an assessment of psychopathy related to recidivism, was "moderate." Based on the actuarial estimates and additional circumstances, including Parsons' recent participation in sex offender treatment and his required one-year period of community supervision upon release, Dr. Damon was unable to conclude that Parsons was more likely than not to commit predatory acts of sexual violence on release.

As the trial court recognized, however, despite calculating an estimated statistical probability of reoffense over varying periods of time, Dr. Damon also summarized his risk assessment by describing Parsons' scores in the "Moderate-High range" for sexual reoffense on the Static-99R and Static-2002R and in the "High range" on the MnSOST-R. Dr. Damon noted that the Static-99R and MnSOST-R estimated the probability of being arrested for, charged with, or convicted of a new sexual offense. Consequently, "the probability that an offender will commit a new sexual offense is necessarily higher than the probability that he will be detected, arrested, prosecuted, and convicted of

committing a new sexual offense." Dr. Damon acknowledged that Parsons' sex offense history remained "extremely troubling in its longevity and number of victims."

Dr. Damon also recognized that Parsons' numerous dynamic risk factors remained potential problem areas. These included "lack of relationship stability, emotional identification with children, hostility towards women, lack of concern for others, social rejection/loneliness, sexual preoccupation, sexual coping, deviant sexual interests, lack of cooperation with supervision, impulsivity, poor problem solving skills, and negative emotionality/hostility." Dr. Damon concluded that Parsons did not evidence any protective factors, including his current age (52), that weighed in favor of a reduced risk of reoffense.

When considered as true, the foregoing circumstances, which Dr. Damon clearly recognized as tempering his own ultimate conclusion, support a reasonable inference that, more likely than not, Parsons would commit predatory acts upon release. The evidence established probable cause to believe that Parsons was a sexually violent predator.

Parsons also contends that the trial court applied an erroneous legal standard when determining probable cause. The record fails to support this claim.

RCW 71.09.040(1) directs the trial court to determine whether there is probable cause to believe that the person named in the petition is a "sexually violent predator." A "sexually violent predator" is defined as a "person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). Parsons argues that

the trial court misconstrued the relevant statutory criteria and "diluted" (Br. of Appellant at 11) the evidentiary threshold during its oral decision by referring to whether he was "likely to engage in future violent criminal offenses" rather than "predatory acts of sexual violence."

During the probable cause hearing, the assistant attorney general argued there were sufficient facts before the trial court to establish probable cause and expressly recited the relevant statutory criteria, including the likelihood that Parsons would engage "in predatory acts of sexual violence if he's not confined in a secure facility." The trial court expressly referenced these criteria in its oral decision when it determined that it could "reach its own independent conclusion as to whether or not Mr. Parsons meets the statutory definition." The court's oral decision focused on Dr. Damon's evaluation, which repeatedly and accurately set forth the relevant statutory criteria.

Viewed in context, the trial court clearly used the terms "violent criminal offenses" and "criminal sexual offenses" as an informal reference to the statutory requirements. The parties and the court clearly understood that the primary disputed issue was the likelihood that Parsons would engage in predatory acts of sexual violence. Nothing in the record reflects any uncertainty by the court or the parties regarding the statutory criteria or the standards governing probable cause. The court's written probable cause order recites the correct legal standard. Parsons fails to demonstrate any error.

Finally, Parsons contends that the trial court violated his right to due process when it placed unreasonable restrictions on his right to be present at trial. He argues that the court effectively forced him to abandon his right to be present when it informed him that any waiver would be effective for the whole trial and that he could not later

change his mind and return. But Parsons raised no objection during the colloquy at trial, and he has not cited any relevant authority suggesting that the trial court's advisement was inaccurate, misleading, or unlawful. Nor has he made any showing that his waiver was not entirely knowing and voluntary.

At the beginning of the commitment trial, defense counsel informed the trial court that Parsons was "very concerned" about sitting through the trial and did not "want to be here any longer." RP (Feb. 29, 2012) at 2. Counsel acknowledged that Parsons understood that he would have to return to testify, but that he wanted to "to waive his presence" for all remaining portions of the trial. RP (Feb. 29, 2012) at 2. The State objected, arguing that Parsons' absence would prejudice the State's case and deprive the jury of the opportunity to observe him when witnesses testified at trial. The trial court ruled that it would not order Parsons to be present at trial involuntarily, except to testify.

During the ensuing colloquy, the trial court informed Parsons that any waiver would be "effective for the rest of the trial" and that he could not "come back tomorrow and say, oh, I've changed my mind." RP (Feb. 29, 2012) at 4. Parsons acknowledged that he understood this restriction and then repeated that it was his intention not to be present during the remainder of the trial because he did not want "to cause any further trauma for the victims seeing me or any of that." RP (Feb. 29, 2012) at 4. Parsons also stated that he understood the trial court's concern that his absence "may be prejudicial to you with the jury." RP (Feb. 29, 2012) at 4.

Parsons expressed no hesitation, confusion, or objection during the colloquy. Nor does he allege that he later sought to retract his waiver or wanted to be present at

any stage of the trial. The record amply establishes Parsons was fully informed about the consequences of the waiver and that he voluntarily waived his right to be present.

Parsons asserts that it was "manifestly unreasonable" for the trial court to construe his waiver as preventing him from changing his mind and returning to attend the trial. For this proposition, Parsons relies solely on State v. Garza, 150 Wn.2d 360, 777 P.3d 347 (2003). In Garza, a criminal prosecution, the court addressed whether the defendant, who had initially appeared at the beginning of his trial, voluntarily absented himself when he was arrested and incarcerated on another charge. Garza has no application to the facts here, where the defendant affirmatively and repeatedly told the court that he did not want to be present at trial.

Affirmed.

WE CONCUR:

-10-